# McCRAY *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR
THE SOUTHERN DISTRICT OF OHIO.

No. 301. Argued December 2, 1903.—Decided May 31, 1904.

The judiciary is without authority to avoid an act of Congress lawfully exerting the taxing power, even in a case where to the judicial mind it seems that Congress had, in putting such power in motion, abused its lawful authority by levying a tax which was unwise or oppressive, or the result of the enforcement of which might be to indirectly affect subjects not within the powers delegated to Congress, nor can the judiciary inquire into the motive or purpose of Congress in adopting a statute levying an excise tax within its constitutional power.

While both the Fifth and Tenth Amendments qualify, in so far as they are applicable, all the provisions of the Constitution, nothing in either of them operates to take away the grant of power to tax conferred by the Constitution upon Congress, and that power being unrestrained except as limited by the Constitution, Congress may select the objects upon which the tax shall be levied, and in exerting the power no want of due process of law can possibly result, and the judiciary cannot usurp the functions of the legislature in order to control that branch of the Government in exercising its lawful functions.

The manufacture of artificially colored oleomargarine may be prohibited by a free government without a violation of fundamental rights.

There is such a distinction between natural butter artificially colored, and oleomargarine artificially colored so as to cause it to look like butter that the taxing of the latter and not the former cannot be avoided as an arbitrary exertion of the taxing power of Congress without any basis of classification, taxing one article and excluding another of the same class.

The Oleomargarine Act of 1886, 24 Stat. 209, as amended by the act of 1902, 32 Stat. 93, imposing a tax of one quarter of one per cent on oleomargarine not artificially colored any shade of yellow so as to look like butter and ten cents a pound if so colored, levies an excise tax and is not unconstitutional as outside of the powers of Congress, or an interference with the powers reserved to the States, nor can the judiciary declare the tax void because it is too high nor because it amounts to a destruction of the business of manufacturing oleomargarine, nor because it discriminates against oleomargarine and in favor of butter.

Where a manufacturer of oleomargarine uses as an ingredient butter artificially colored he thereby gives to the manufactured product artificial

coloration within the meaning of the Oleomargarine Act as amended in 1902 and the product is subject to taxation at the rate of ten cents per pound.

THE United States sued McCray for a statutory penalty of $50, alleging that, being a licensed retail dealer in oleomargarine, he had, in violation of the acts of Congress, knowingly purchased for resale a fifty-pound package of oleomargarine, artificially colored to look like butter, to which there were affixed internal revenue stamps at the rate of one-fourth of a cent a pound, upon which the law required stamps at the rate of ten cents per pound. The answer of McCray, whilst admitting the purchase of the package stamped as alleged, set up two defences.

*First.* It was averred that the oleomargarine in question was made by a duly licensed manufacturer, the Ohio Butterine Company, from a formula used by it in making a high grade oleomargarine composed of " the following ingredients and none other, in these proportions: oleo oil, 20 pounds; natural lard, 30 pounds; creamery butter, 50 pounds; milk and cream, 30 pounds; common salt, 7 pounds." It was asserted that whilst it was true that the oleomargarine made from the ingredients in question was of a yellow color, that this result was not caused by artificial coloration, but was solely occasioned by the fact that the butter which was bought in open market and used in making the oleomargarine had a deep yellow color imparted to it (the butter) by a substance known as Wells-Richardson's improved butter color. This preparation, it was averred, was not injurious to health, and was constantly used in the United States in the manufacture of butter made from pure milk or cream, for the purpose of imparting to it a deep yellow color. Averring that a yellow color produced in oleomargarine by the employment of butter, as an ingredient, which was artificially colored, did not amount to an artificial coloration of the oleomargarine within the meaning of the statute, it was asserted that the tax of one-fourth of a cent per pound was a compliance with the law.

*Second.* If the act of Congress imposing the tax, when rightfully construed, required stamps at the rate of ten cents per pound upon oleomargarine, colored as described in the first defence, the act levying such tax was charged to be repugnant to the Constitution of the United States. As a foundation for this defence the answer contained the following averments:

Whilst butter made from pure milk and cream in the spring season was of a deep yellow color, such butter when made at all other seasons was of a pale yellow; that the taste of consumers of butter in the United States required all butter to possess the deep color naturally belonging to butter made in the spring season, and hence it had come to pass, that substantially all butter manufactured for sale in the United States, not made in the spring season and not naturally of a deep yellow, was colored artificially so as to cause it to have the deep yellow of spring butter. It was alleged that this deep yellow coloration of natural butter was universally produced by the use of either Wells-Richardson's compound or some other coloring ingredient, which did not change the taste of the butter, none of which were injurious to health. Oleomargarine, it was alleged, derived its chief value as an article of food as a substitute for butter, and that growing out of the taste of the consumers, unless the oleomargarine which was naturally white could be colored yellow, to present the appearance of butter artificially colored, there was no demand for it, and its manufacture and sale would be commercially impossible. It was then averred that to impose upon the colored oleomargarine a tax of ten cents per pound would burden it with such a charge as to render it impossible to make and sell it in competition with butter, and therefore the result of imposing a tax of ten cents a pound on oleomargarine when artificially colored would destroy the oleomargarine industry. From these averments it was charged that if the law imposed the tax of ten cents upon the oleomargarine in question the statute was repug-

nant to the Constitution, because it deprived the defendant of his property without due process of law; because the levy of such a burden was beyond the constitutional power of Congress, since it was an unwarranted interference by Congress "with the police powers reserved to the several States and to the people of the United States by the Constitution of the United States;" and further, that said acts of Congress were repugnant to the Constitution, since they finally lodged in an executive officer the power to determine what constituted artificial coloration of oleomargarine, and therefore invested such officer with judicial authority; and, finally, because the attempt by Congress to levy a tax at the rate of ten cents a pound arbitrarily discriminated against oleomargarine in favor of butter, to the extent of destroying the oleomargarine industry for the benefit of the butter industry, and was, therefore, violative of "those fundamental principles of equality and justice which are inherent in the Constitution of the United States."

The Government demurred to the answer on the ground that it stated no defence. The demurrer was sustained and McCray electing to plead no further, the court found the facts alleged in the petition to be true, and adjudged that the Government recover "the sum of fifty dollars as a penalty and costs." Because of the questions arising under the Constitution, the case was then brought directly to this court.

*Mr. William D. Guthrie* and *Mr. Miller Outcalt,* with whom *Mr. Charles E. Prior, Mr. Francis J. Kearful, Mr. Delavan B. Cole* and *Mr. Charles C. Carnahan,* were on the brief, for plaintiff in error:

As to the power of Congress to levy excise taxes on manufactures, and the power of the courts to prevent abuse of its powers by Congress, see *Veazie Bank* v. *Fenno,* 8 Wall. 533, 541.; *Fairbank* v. *United States,* 181 U. S. 283, 290; the Federalist No. 78; *Barron* v. *Baltimore,* 7 Pet. 243, 250; *Marbury* v. *Madison,* 1 Cranch, 137, 176 ; *McCulloch* v. *Mary-*

*land*, 4 Wheat. 316, 421; *Hepburn* v. *Griswold*, 8 Wall. 603, 614; *Smyth* v. *Ames*, 169 U. S. 466, 527; *Re Jacobs*, 98 N. Y. 98, 112.

For the restrictive character of the Fifth Amendment, see *Prout* v. *Starr*, 188 U. S. 537. There are, however, no decisions as to whether there are any limitations on Congress other than those of apportionment and geographical uniformity. *Collector* v. *Day*, 11 Wall. 113, 124; *United States* v. *Railroad Company*, 17 Wall. 322; *Van Brocklin* v. *Tennessee*, 117 U. S. 151, 178; *Bank* v. *New York*, 121 U. S. 138, 162; *Income Tax Cases*, 157 U. S. 429, 584; *Plummer* v. *Coler*, 178 U. S. 115; *Ambrosini* v. *United States*, 187 U. S. 1, 7; *Snyder* v. *Bettman*, 190 U. S. 249; *Wright* v. *Davidson*, 181 U. S. 371, 377; *Patton* v. *Brady*, 184 U. S. 608, 622; *Knowlton* v. *Moore*, 178 U. S. 41, 92, 110; *Parsons* v. *District of Columbia*, 170 U. S. 45, 51. Congress has no power whatever to regulate the internal commerce of the States, which was expressly reserved to the States by the Tenth Amendment. *Gibbons* v. *Ogden*, 9 Wheat. 1, 194, 203; *License Cases*, 5 How. 504, 574, 599; *Passenger Cases*, 7 How. 283, 400; *License Tax Cases*, 5 Wall. 462, 470–471; *United States* v. *Dewitt*, 9 Wall. 41, 44; *Trade-Mark Cases*, 100 U. S. 82, 96–97; *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 12, 13. The police power never was surrendered by the States. *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 661; see also, *In re Rahrer*, 140 U. S. 545, 554, 556; *Plumley* v. *Massachusetts*, 155 U. S. 461, 472; *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 11, 13; *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, 558. The act now before the court, if grounded upon the attempt to regulate the manufacture of dairy products and oleomargarine and their sale in the internal commerce of the States, would be clearly beyond the powers of Congress and unconstitutional. *United States* v. *Dewitt*, 9 Wall. 41, 45; *United States* v. *Fox*, 94 U. S. 315, 320; *Trade-Mark Cases*, 100 U. S. 82, 96; *Covington &c. Bridge Co.* v. *Kentucky*, 154 U. S. 204, 210; *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 12, 13; *United States* v. *Boyer*, 85 Fed. Rep. 424, 432.

The provisions of this act, so far as· they affect the internal commerce of a State, can, therefore, only be sustained under the taxing power of Congress. While the act is called a tax law it imposes a burden on a recognized article of commerce of the States. *Schollenberger* v. *Pennsylvania,* 171 U. S. 1, 8; and, whatever its guise a statute must be judged by the practical operation of its provisions. *Henderson* v. *Mayor,* 92 U. S. 259, 268; *Morgan* v. *Louisiana,* 118 U. S. 455, 462; *Collins* v. *New Hampshire,* 171 U. S. 30; *Mugler* v. *Kansas,* 123 U. S. 623, 661; *Fairbank* v. *United States,* 181 U. S. 283; *Woodruff* v. *Parham,* 8 Wall. 123; *Postal Tel. Co.* v. *Adams,* 155 U. S. 688, 698; *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429, 581; *Thomas* v. *Gay,* 169 U. S. 264, 283; *Smith* v. *St. &c. Ry. Co.,* 181 U. S. 248, 257. For cases in which this court has determined the difference between a legal tax and illegal burdens imposed by both state and Federal authorities, see *Pace* v. *Burgess; Collector,* 92 U. S. 372; *Fairbank* v. *United States,* 181 U.. S. 283, 290; *Helwig* v. *United States,* 188 U. S. 605, 611; *Atlantic &c. Tel. Co.* v. *Philadelphia,* 190 U. S. 160; *Smyth* v. *Ames,* 169 U. S. 466, 527; *Patapsco Guano Co.* v. *North Carolina,* 171 U. S. 345, 351; *Maine* v. *Grand Trunk Ry. Co.,* 142 U. S. 217, 228; *Ficklen* v. *Shelby County,* 145 U. S. 1, 23; *Postal Telegraph Cable Co.* v. *Adams,* 155 U. S. 688, 697; *Adams Express Co.* v. *Ohio,* 165 U. S. 194, 220; *Adams Express Co.* v. *Kentucky,* 166 U. S. 171, 180; *Adams Express Co.* v. *Ohio,* 166 U. S. 185, 221. See also cases where confiscation of property cannot be effected by acts purporting to be police regulations. *Ches. & Pot. Tel. Co.* v. *Manning,* 186 U. S. 238, 250; *Cotting* v. *Stock Yards,* 183 U. S. 79, 85, and cases cited.

The tax is so large that it is evident that it was imposed, not as an excise for revenue, but as a prohibition.

A State, under the power to regulate its internal commerce, can prohibit the manufacture and sale of oleomargarine. *Powell* v. *Pennsylvania,* 127 U. S. 678, 686; *Plumley* v. *Massachusetts,* 155 U. S. 461, 467, and *Capital City Dairy Co.* v.

*Ohio,* 183 U. S. 238, 246, but it cannot prohibit the sale of oleomargarine manufactured in other States and offered for sale in the course of interstate commerce. *Schollenberger* v. *Pennsylvania,* 171 U. S. 1, 21, 25. A State surely cannot indirectly prohibit interstate commerce in oleomargarine by taxing it to death.

If a State should impose a tax upon a commercial commodity as *property* and the effect of such a tax, as to articles brought from other States, was to destroy all opportunity to sell the commodity, the law would be unconstitutional as interfering with interstate commerce even though the same amount of tax should be laid on domestic manufactures as property, and even though such a tax would only apply after the "original package" of importation had been broken and the contents exposed for sale. *Woodruff* v. *Parham,* 8 Wall. 123, 131; *Brown* v. *Houston,* 114 U. S. 622, 634. Where the State may prohibit as a police regulation, different considerations are presented. Cooley on Taxation, 11; *Hinson* v. *Lott,* 8 Wall. 148, 152; *Postal Telegraph Cable Co.* v. *Adams,* 155 U. S. 688, 697; *American Refrigerator Transit Co.* v. *Hall,* 174 U. S. 70, 74; *Reymann Brewing Co.* v. *Brister,* 179 U. S. 445, 453; *Caldwell* v. *North Carolina,* 187 U. S. 622, 633; *May* v. *New Orleans,* 178 U. S. 496, 508; *Leloup* v. *Port of Mobile,* 127 U. S. 640, 647; *Brennan* v. *Titusville,* 153 U. S. 289, 303; *Fertilizer Co.* v. *Board of Agriculture,* 43 Fed. Rep. 609, 613.

Where a tax is in the form of an inspection tax it is relevant to show that it is not large enough to operate as a penalty or prohibition. *Ward* v. *Maryland,* 12 Wall. 418, 425; *Welton* v. *State of Missouri,* 91 U. S. 275; *People* v. *Compagnie Gen. Transatlantique,* 107 U. S. 59; *Moran* v. *New Orleans,* 112 U. S. 69; *Walling* v. *Michigan,* 116 U. S. 446, 461; *Emert* v. *Missouri,* 156 U. S. 296, 311.

The principal argument in support of the bill is based on the phrase "the power to tax involves the power to destroy." *McCulloch* v. *Maryland,* 4 Wheat. 316, 431; *Veazie Bank* v. *Fenno,* 8 Wall. 533. This applies however only to a

legitimate tax law.  *Cohens* v. *Virginia*, 6 Wheat. 264, 399. See *Birney* v. *Tax Collector*, 2 Bailey (S. C.), 654, 674, and *Hepburn* v. *Griswold*, 8 Wall. 603, 636; *National Bank* v. *United States*, 101 U. S. 1, 5; and as to application of the *Veazie Bank Case*, see *Head-Money Cases*, 112 U. S. 580, 596; *Loan Association* v. *Topeka*, 20 Wall. 655, 663, in which the unlimited power to tax is confined to a purpose for which taxation is lawful.  To the same effect, see *Parkersburg* v. *Brown*, 106 U. S. 487, 500; *Cole* v. *LaGrange*, 113 U. S. 1, 6; *The State ex rel.* v. *Osawkee Township*, 14 Kansas, 418, 427; *Lowell* v. *Boston*, 111 Massachusetts, 454, 461; *Mead* v. *Acton*, 139 Massachusetts, 341, 344; *Allen* v. *Inhabitants of Jay*, 60 Maine, 124, 128, 138; *Sugar Co.* v. *Auditor General*, 124 Michigan, 674, 678; *State* v. *Foley*, 30 Minnesota, 350, 357; *Weismer* v. *Village of Douglas*, 64 N. Y. 91, 100; *Bertholf* v. *O'Reilly*, 74 N. Y. 509, 515; *Sharpless* v. *Mayor of Philadelphia*, 21 Pa. St. 147, 168; Burroughs on Taxation, pp. 6, 506; Harlan J., in dissenting in *Fairbank* v. *United States*, 181 U. S. 283, 318.

The prohibition of yellow oleomargarine in order to facilitate the collection of the tax on other oleomargarine is too remote to justify the prohibitive tax of ten cents.  *United States* v. *Dewitt*, 9 Wall. 41, 44.

As to the restrictions upon the taxing power contained in the Fifth Amendment, see *Loan Association* v. *Topeka*, 20 Wall. 655, 664; *Dartmouth College Case*, 4 Wheat. 514, 644 ; *The Slaughter-House Case*, 16 Wall. 36, 72; *Ex parte Virginia*, 100 U. S. 339, 347, 361; *Holden* v. *Hardy*, 169 U. S. 366, 382; *United States* v. *Wong Kim Ark*, 169 U. S. 649, 676; *County of Santa Clara* v. *Southern Pac. R. Co.*, 18 Fed. Rep. 385, 399; affirmed 118 U. S. 394, 417, 422; *Yick Wo* v. *Hopkins*, 118 U. S. 356, 370; Story on the Constitution, § 1945; Cooley's Const. Lim. 6th ed. p. 433.  See Justice Johnson's exposition in *Bank of Columbia* v. *Okely*, 4 Wheat. 235, 244, often quoted with approval; *United States* v. *Cruikshank*, 92 U. S. 542, 554; *Hurtado* v. *California*, 110 U. S. 516,

527; *Caldwell* v. *Texas*, 137 U. S. 692, 697; *Scott* v. *McNeal*, 154 U. S. 34, 45; *Taylor* v. *Beckham*, 178 U. S. 548, 592. See also as to due process of law, *Giozzo* v. *Tiernan*, 148 U. S. 657, 662; *Duncan* v. *Missouri*, 152 U. S. 377, 382; *Thomas* v. *Gay*, 169 U. S. 264, 283; *Norwood* v. *Baker*, 172 U. S. 269, 279. This court has never attempted to define " due process of law." *Holden* v. *Hardy*, 169 U. S. 366, 389. But the meaning is no narrower when applied to Federal, than when it is to state government. *Sinking Fund Cases*, 99 U. S. 700, 718; *French* v. *Asphalt Co.*, 181 U. S. 324, 355. And a state statute preventing all sales of oleomargarine as an article of commerce would not be valid. *Powell* v. *Pennsylvania*, 127 U. S. 678, 685; *Plumley* v. *Massachusetts*, 155 U. S. 461, 467. Congress cannot in exercising its powers act arbitrarily. *Lottery Case*, 188 U. S. at p. 363; *Interstate Com. Com.* v. *Brimson*, 154 U. S. 447, 479. The restrictive clause of the Fifth Amendment applying to the exercise of the taxing power, its prohibition or limitation should be enforced in its spirit and to its entirety as fully as if it were part of the very article conferring the taxing power. *Prout* v. *Starr*, 188 U. S. 537, 543; *Fairbank* v. *United States*, 181 U. S. 283, 288. The act purports strictly to levy an excise tax, *Patton* v. *Brady*, 184 U. S. 608, 618, but an exaction made without regard to any rule of apportionment is not authorized by law, Cooley's Pr. Const. Law, 3d ed. p. 56, and does not come within the definitions of taxation. *Gibbons* v. *Ogden*, 9 Wheat. 1, 199; *Oliver* v. *Washington Mills*, 11 Allen, 268, 274, and cases cited; 15 Op. Atty. Genl. 219.

While the power to tax undoubtedly involves the power to classify for purposes of taxation, due process of law requires that classification shall be something more than mere arbitrary selection as is the case in this statute. As to the exercise of the power of classification, see *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, 563; *Gulf &c. Ry. Co.* v. *Ellis*, 165 U. S. 150, 154; *State* v. *Loomis*, 115 Missouri, 307, 314. The right to earn one's livelihood by any lawful calling constitutes the

liberty and property of the individual and one of the inalienable privileges and immunities of every citizen of the United States which are secured by the Constitution. *Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 746, 757, 764; *Powell* v. *Pennsylvania*, 127 U. S. 678, 684; *Allgeyer* v. *Louisiana*, 165 U. S. 578, 589; *People* v. *Marx*, 99 N. Y. 377, 386; *People* v. *Gillson*, 109 N. Y. 389, 399.

The contention of the plaintiff does not limit the taxing power of the Federal government but simply declares that in the exercise of the taxing power Congress may not impose prohibitory taxes upon internal products based upon the fact that a manufactured article resembles and competes with another product which is not taxed; in other words, that it may not destroy the property of one class of its citizens for the benefit of another class.

Section 14 of the act conferring judicial power upon the Commissioner of Internal Revenue is invalid. *United States* v. *Eaton*, 144 U. S. 677, 688; *United States* v. *Maid*, 116 Fed. Rep. 650; *United States* v. *Blasingame*, 116 Fed. Rep. 654. *In re Kollock*, 165 U. S. 526, 533, distinguished.

According to the ruling of the Commissioner, the word "artificial" is made to include "natural," a word of opposite meaning, for it is undisputed that the yellow color of palm oil is a natural color, and the exception would be, not of oleomargarine "free from artificial coloration" but of oleomargarine "free from coloration." The established rule is that the intention to tax in a particular manner must be expressed in clear and unambiguous language, else it cannot be enforced, and that words of exception are to receive a liberal rather than a constricted construction, to the end that the burdens imposed upon individuals may be confined rather than extended. The rule together with its supporting authorities is stated in *Eidman* v. *Martinez*, 184 U. S. 578, 583. See also *Adams* v. *Bancroft*, 3 Sumner, 384, 387; *Schoenemann* v. *United States*, 119 Fed. Rep. 584, 587; *In re Southern Pac. Co.*, 82 Fed. Rep. 311, 313; 87 Fed. Rep. 863; *Matheson*

& Co. v. *United States*, 71 Fed. Rep. 394, 395; *Rice* v. *United States*, 53 Fed. Rep. 910, 911; *Dean* v. *Charlton*, 27 Wis. 522, 526.

*Mr. Solicitor General Hoyt* for the United States:

The tax being an excise, the only limitation upon the power of Congress to impose the tax is that it shall be "uniform" throughout the United States. Const. art. 1, §8, cl. 1.. A tax is "uniform" when it operates with the same force and effect in every place where the subject of it is found. *Head Money Cases*, 112 U. S. 594; *Knowlton* v. *Moore*, 178 U. S. 106.

Congress may classify property for purposes of taxation. *Magoun* v. *Illinois Trust & Savings Bank*, 170 U. S. 283; *Nicol* v. *Ames*, 173 U. S. 509.

The law does not violate those provisions of the Fifth Amendment which declare that no person shall be deprived of his liberty or property without due process of law; nor shall private property be taken for public use without just compensation. The latter clause refers only to a direct appropriation of property for public purposes and not to a so-called taking as the effect of taxation. *Legal Tender Cases*, 12 Wall. 551; *Transportation Co.* v. *Chicago*, 99 U. S. 642; *Mugler* v. *Kansas*, 123 U. S. 668. *Loan Association* v. *Topeka*, 20 Wall. 665, involved the taking of property by way of taxes in aid of a private enterprise and is not to the contrary.

Due process of law is provided. The law subjects artificially colored oleomargarine to one rate of tax and uncolored oleomargarine to another rate; in case of a dispute respecting the taxability of the article an appeal is provided from the collector to the Commissioner of Internal Revenue; and, in certain cases, a further appeal is allowed. This is due process. Executive process may be due process. *The Japanese Immigrant Case*, 189 U. S. 86.

It is asserted that the tax imposed is confiscatory, and therefore loses its character as an excise and becomes a reg-

ulation of manufacture. But the power to tax is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than those prescribed in the Constitution. *McCulloch* v. *Maryland*, 4 Wheat. 431; *Gibbons* v. *Ogden*, 9 Wheat. 196; *License Tax Cases*, 5 Wall. 471; *Pacific Ins. Co.* v. *Soule*, 7 Wall. 443; *Knowlton* v. *Moore*, 178 U. S. 58. The right of taxation, where it exists, is necessarily unlimited in its nature. It carries with it inherently the power to embarrass and destroy. *Austin* v. *The Alderman*, 7 Wall. 699.

Although the power to tax may be exercised oppressively, or unwisely, the responsibility of the legislature is not to the courts but to the people; for the judicial cannot prescribe to the legislative department of the Government limitations upon the exercise of its acknowledged powers. *Veazie Bank* v. *Fenno*, 8 Wall. 548; *Spencer* v. *Merchant*, 125 U. S. 355; *Champion* v. *Ames*, 188 U. S. 363. The decisions in *Hepburn* v. *Griswold*, 8 Wall. 603, and *National Bank* v. *United States*, 101 U. S. 6, are not to the contrary.

By the Constitution, the Government is divided into three distinct and independent branches, and it is the duty of each to abstain from, and to oppose, encroachments on the other. *Hayburn's Case*, 2 Dall. 410. The court cannot, therefore, interpose to declare an act of Congress, passed within the general scope of its constitutional power, void, merely because it may be, in the court's judgment, contrary to the principles of natural justice. The ideas of natural justice are regulated by no fixed standard and a court in declaring for that reason only, a law invalid, would be merely substituting its opinion for that of Congress. *Calder* v. *Bull*, 3 Dall. 399; *Griswold* v. *Hepburn*, 8 Wall. 637; *Legal Tender Cases*, 12 Wall. 552; *Kilbourn* v. *Thompson*, 103 U. S. 190.

It is not within the province of the court to consider why one class of property is taxed and another is not taxed. *Treat* v. *White*, 181 U. S. 268; or to inquire into the reasonableness of the excise, either as to the amount, or the property upon which it is imposed. *Patton* v. *Brady*, 184 U. S. 623.

The provision of § 14 which authorizes the Commissioner of Internal Revenue to decide what substances or compounds are subject to the tax, does not confer upon that officer judicial power. He does not hear and decide a case as a judge does; his action is but the ascertainment of a scientific fact by a scientific process and the application of the law to the facts so found. Such action is not judicial, but administrative in its nature and constitutes due process. *Martin* v. *Mott,* 12 Wheat. 19, 31; *Railroad Co.* v. *Stimpson,* 14 Pet. 458; *Murray's Lessees* v. *Hoboken Land Co.,* 18 How. 275; *Craig* v. *Leitensdorfer,* 132 U. S. 211; *Nishimura Ekiu* v. *United States,* 142 U. S. 660; *Fong Yue Ting* v. *United States,* 149 U. S. 714; *Lem Moon Sing* v. *United States,* 158 U. S. 544; *Bushnell* v. *Leland,* 164 U. S. 685; *Chin Bak Kan* v. *United States,* 186 U. S. 193; *United States* v. *Moline,* 82 Fed. Rep. 592; *Chatfield* v. *New Haven,* 110 Fed. Rep. 788; *Dastervignes* v. *United States,* 122 Fed. Rep. 30; *Weimer* v. *Bunbury,* 30 Michigan, 211; *State* v. *Harmon,* 31 Ohio St. 258; *Musser* v. *Adair,* 55 Ohio St. 466; *Anderson* v. *Timme,* 60 Wisconsin, 344; *Donahue* v. *Will County,* 100 Illinois, 107, 110.

If the provision of § 14 of the original act, and amended § 8, be invalid, the entire law does not thereby fall, for the act may be fully executed without those provisions. This is not a penal law, but a revenue measure, and its provisions are to be liberally construed. *Field* v. *Clark,* 143 U. S. 697. If the valid portions of an act are separable and, standing alone, will fully carry out its purposes, the court will not declare the whole act void but will give effect to its valid provisions. *Packet Co.* v. *Keokuk,* 95 U. S. 89; *Allen* v. *Louisiana,* 103 U. S. 83; *Railroad Co.* v. *Schutte,* 103 U. S. 142; *Penniman's Case,* 103 U. S. 716; *Supervisors* v. *Stanley,* 105 U. S. 312; *Virginia Coupon Cases,* 114 U. S. 304; *Presser* v. *Illinois,* 116 U. S. 263; *Huntington* v. *Worthen,* 120 U. S. 102; *Ellenbecker* v. *Plymouth County,* 134 U. S. 40; *Pollock* v. *Farmers' Loan & Trust Co.,* 158 U. S. 636.

The cases of *Spraigue* v. *Thompson,* 118 U. S. 94; *James* v.

*Bowman,* 190 U. S. 141, and *Trade Mark Cases,* 100 U. S. 98, can be distinguished from the cases just cited.

. If amended § 8 be invalid, then all oleomargarine is subject to the tax of two cents per pound imposed by the original law; for an unconstitutional act is, in legal contemplation, as inoperative as though it had never been passed. *Norton* v. *Shelby County,* 118 U. S. 442.

. In construing an act of Congress the court will not recur to the views of individual members in debate, nor consider their motives in voting for or against its passage, but the court may, for its information, with propriety recur to the history of the times when it was passed: *United States* v. *Union Pacific R. R. Co.,* 91 U. S. 79; *Soon Hing* v. *Crowley,* 113 U. S. 710; *Powell* v. *Pennsylvania,* 127 U. S. 685; *United States* v. *Freight Association,* 166 U. S. 318; *Camfield* v. *United States,* 167 U. S. 523; *Dunlap* v. *United States,* 173 U. S. 75; *Maxwell* v. *Dow,* 176 U. S. 601; *Knowlton* v. *Moore,* 178 U. S. 72; *Dobbins* v. *Los Angeles,* 72 Pac. Rep. 971; Cooley's Const. Lim. 6th ed. 231.

The constitutionality of the law being assailed on the ground of the alleged excessive rate of the tax, the court will not confine itself to the testimony in the records, but will take into consideration all facts respecting oleomargarine of which it may take judicial notice.

The court will take judicial notice of general usages of trade and commerce, *Bank of Augusta* v. *Earle,* 13 Pet. 590; of that which is a matter of general knowledge within its jurisdiction and of public records and documents. *Brown* v. *Piper,* 91 U. S. 42; *Bank of Kentucky* v. *Adams Express Co.,* 93 U. S. 185; *Brown* v. *Spillman,* 155 U. S. 670; *Mills* v. *Green,* 159 U. S. 657; *The Delaware,* 161 U. S. 472; *New York Indians* v. *United States,* 170 U. S. 32; *Nicol* v. *Ames,* 173 U. S. 517; *United States* v. *Rio Grande Dam & Irrigation Co.,* 174 U. S. 698; 1 Greenleaf on Evidence, §§ 5, 6.

The court, then, may properly look to the laws of the various States and to the decisions of the various courts upon the

subject for information.   In twenty-nine of the States the line
is drawn between uncolored oleomargarine and that colored in
imitation of butter, the manufacture and sale of the latter be-
ing forbidden.   The line is thus drawn between the legitimate
article on the one hand and  the fraudulent imitation on the
other.   The States have thus created a classification and
Congress, in grading the tax, has merely recognized that
classification.   This forms· a proper basis for classification.·
The court has recognized this distinction in a number of cases.
*Powell* v. *Pennsylvania,* 127  U. S: 678; *Plumley* v. *Massa-
chusetts,* 155 U. S. 461; *Schollenberger* v. *Pennsylvania,* 171
U. S. 1; *Collins* v. *New Hampshire,* 171 U. S. 30; *Capital City
Dairy Co.* v. *Ohio,* 183 U. S. 238.

The classification may also be sustained as a means to pre-
vent fraud in the collection of the tax laid upon the legiti-
mate or uncolored oleomargarine.   If oleomargarine can, by
means of coloration, successfully counterfeit butter, an untaxed
article, it may in that way evade the tax imposed upon it.
The degree of the tax is for Congress to determine.

It rests with Congress to say what means shall be adopted
to prevent fraud in the collection of its revenue.   *United
States* v. *132 Packages of Liquors,* 76 Fep. Rep. 364; *Nicol* v.
*Ames,* 173 U. S. 524; *Felsenheld* v. *United States,* 186 U. S.
131; *United States* v. *Three Packages Distilled Spirits,* 125 Fed.
Rep. 55; *United States* v. *Singer,* 15 Wall. 120.

The tax of ten cents per pound upon oleomargarine colored
in imitation of butter is not prohibitive of its manufacture and
sale.   See vol. 9, Manufactures, p. 3, Census Report, 1900, for
summary of facts respecting the relative cost and value of
butter and of oleomargarine.   These facts show that the cost
and value of oleomargarine, with the ten cent tax added,
about equals the cost and value of butter.

In the testimony for the dealers it is stated that good but-
ter costs on an average two cents per pound more than colored
oleomargarine in the Chicago market.   In the face of this tes-
timony it cannot be said with force that the falling off in

production is due to the rate of tax. The falling off is merely indicative of the quantity of colored oleomargarine fraudulently sold as butter. If one effect of the law be to prevent that fraud, the court for that reason will not declare the law invalid.

If there be a legitimate demand for colored oleomargarine, as such, the fact that it cannot be sold at butter prices will not destroy the demand for it. If people prefer it to butter, they will pay the increase in price, especially when the excess, at most, is very trifling. This is true as to tobacco, liquors, and imports subject to heavy duties.

The law does not deprive citizens of Illinois and Ohio of any right guaranteed them by their States, for both States absolutely prohibit the manufacture and sale of oleomargarine artificially colored so as to resemble butter.

In the manufacture of oleomargarine, the use of butter containing artificial coloration, subjects the product to the ten cent tax; for it cannot be said to be "free from artificial coloration" within the meaning of § 8, when in fact artificial coloring matter has been introduced into the product at any stage of its manufacture, by any means whatever.

As to coloration by means of palm oil: to subject a compound to the tax, it is only necessary that it be composed of some of the substances named in the act and "made in imitation or semblance of butter;" it need not be "calculated or intended to be sold as butter or for butter."

Vegetable oils may properly be used in the manufacture of oleomargarine when of such a character as to be naturally adapted for use as food in the form in which used. Palm oil is not such an oil. Unless chemically refined, in color it is a dark orange, with a large per cent of acids, and with a disagreeable taste and odor. Chemical refining, while taking away most of the acids and odor, also takes away the color, its only desirable property. Unless so refined, it can be used only in very small quantities, for not only would a greater use impart too high a color, but because of the acids, taste,

and odor, would spoil the product. The oil used in this case was not refined, else it would not have imparted the color. Used in such minute quantity as in this case (less than one per cent) the legal presumption is that it was used as a color, and not as a fat. Such use constitutes an artificial coloration. See Lewkowitsch's Chemical Analysis of Oils, 2d ed. p. 517; Allen's Chemical Organic Analysis, vol. 2, pt. 1, 3d ed. p. 161.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

As the controversy in every aspect involves the acts of Congress concerning the taxation of oleomargarine, a summary of those acts becomes essential.

The original act was passed in 1886. 24 Stat. 209. The first section provided:

"That for the purposes of this act the word 'butter' shall be understood to mean the food product usually known as butter, and which is made exclusively from milk or cream, or both, with or without common salt, and with or without additional coloring matter."

The second thus defined oleomargarine:

"That for the purposes of this act certain manufactured substances, certain extracts, and certain mixtures and compounds, including such mixtures and compounds with butter, shall be known and designated as 'oleomargarine,' namely: All substances heretofore known as oleomargarine, oleo, oleomargarine-oil, butterine, lardine, suine, and neutral; all mixtures and compounds of oleomargarine, oleo, oleomargarine-oil, butterine, lardine, suine, and neutral; all lard extracts and tallow extracts; and all mixtures and compounds of tallow, beef-fat, suet, lard, lard-oil, vegetable-oil and annotto, and other coloring matter, intestinal fat, and offal fat made in imitation or semblance of butter, or when so made, calculated or intended to be sold as butter or for butter."

The third, fourth, fifth, sixth and seventh sections imposed

a license on manufacturers and dealers in oleomargarine, and contained many requirements controlling the packing, marketing and supervision of the manufacture and sale of the taxed article. The eighth section provided as follows:

"That upon oleomargarine which shall be manufactured and sold, or removed for consumption or use, there shall be assessed and collected a tax of two cents per pound, to be paid by the manufacturer thereof; . . . The tax levied by this section shall be represented by coupon stamps and the provisions of existing laws governing the engraving, issue, sale, accountability, effacement, and destruction of stamps relating to tobacco and snuff, as far as applicable, are hereby made to apply to stamps provided for by this section."

The other provisions of the statute, not necessary to be noticed, contained many regulations looking to the enforcement and collection of the licenses and taxes which the act imposed. In 1902 further provisions were made on the subject, and the act of 1886 was, in many respects, expressly amended. 32 Stat. 193. The title of the act is—

" An act to make oleomargarine and other imitation dairy products subject to the laws of any State or Territory or the District of Columbia into which they are transported, and to change the tax on oleomargarine, and to impose a tax, provide for the inspection and regulate the manufacture and sale of certain dairy products, and to amend an act entitled ' An act defining butter, also imposing a tax upon and regulating the manufacture, sale, importation and exportation of oleomargarine,' approved August second, eighteen hundred and eighty-six."

The first section provides that all—

" —oleomargarine, butterine, imitation, process, renovated, or adulterated butter, or imitation cheese, or any substance in the semblance of butter or cheese, not the usual product of the dairy and not made exclusively of pure and unadulterated milk or cream, transported into any State or Territory

or the District of Columbia, and remaining therein for use, consumption, sale or storage therein, shall, upon the arrival within the limits of such State or Territory or the District of Columbia, be subject to the operation and effect of the laws of such State or Territory or the District of Columbia . . . to the same extent and in the same manner as though such article or substances had been produced in such State or Territory or the District of Columbia, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise."

Section 2 amends section 3 of the act of 1886 in particulars not necessary for the purposes of this case to be considered. Section 3 amends section 8 of the act of 1886 by increasing the tax on oleomargarine from two (2) to ten (10) cents per pound, with this proviso:

" *Provided,* When oleomargarine is free from artificial coloration that causes it to look like butter of any shade of yellow, said tax shall be one-fourth of one cent per pound. The tax levied by this section shall be represented by coupon stamps ; and the provisions of existing laws governing the engraving, issue, sale, accountability, effacement and destruction of stamps relating to tobacco and snuff, as far as applicable, are hereby made to apply to stamps provided for by this section."

Section 4 reiterates the definition of butter contained in the first section of the act of 1886, and besides gives a definition of " adulterated butter," " process butter " or " renovated butter," and imposes taxes upon the manufacture and sale of these articles, the tax upon adulterated butter being at the rate of ten cents a pound.

The section in question as well as those following it contain many administrative provisions for the enforcement of the taxes levied by the act and concerning interstate and foreign commerce in the articles referred to. Bearing, then, the statutes in mind, we come to consider the assignments of error, which are as follows:

" The District Court erred in sustaining the demurrer of the United States to the answer of plaintiff in error (defendant below).

" The District Court erred in refusing to hold that the act of Congress approved August 2, 1886, as amended by the act of Congress approved May 9, 1902, is in contravention of the Constitution of the United States of America and of the amendments thereto, and is illegal and void, for the reasons:

"(a) The act deprives the defendant of his property without due process of law.

"(b) The act is an unwarranted encroachment upon and an interference with the police powers reserved to the several States and to the people of the United States.

" (c) The act so arbitrarily discriminates against oleomargarine in favor of butter as to destroy the oleomargarine industry for the benefit of the butter industry in the United States, and is thus repugnant to those fundamental principles which are inherent in the Constitution of the United States.

" The District Court erred in holding, if said act be not in contravention of the Constitution of the United States, that oleomargarine, which contains no artificial coloration than that imparted to it by the use of butter which itself contains coloring matter and which therefore causes said oleomargarine to look like butter of a shade of yellow, is subject to a tax of ten cents per pound instead of a tax of one-fourth of one cent per pound."

It is to be observed that in the errors thus assigned no reference is made to the contention in the answer that the acts of Congress were void because conferring upon administrative officers the power to finally decide what constituted artificial coloration, such contention therefore may be put out of view. The errors relied upon embrace not only the contention that the act of Congress imposing the tax is repugnant to the Constitution, but also that the penalty was wrongfully enforced, because the one-quarter of a cent per pound which had been

paid on the oleomargarine was the only tax to which it was liable under the act of Congress when rightly construed. As the presence of the constitutional question imposes upon us the duty of considering also the construction of the statute, we shall invert the order in which the errors have been assigned, and come to consider, first, whether the act of Congress, as properly construed, required on the oleomargarine in question a tax of ten cents a pound; and, second, if it did, whether such act is repugnant to the Constitution of the United States.

1st. *The construction of the statute.*

Leaving out of view the proviso to the eighth section of the act of 1886 as amended and reënacted by the third section of the act of 1902, it is beyond question that a tax of ten cents a pound is imposed upon oleomargarine. As the product was admitted by the answer to be oleomargarine, it follows that it was subject to the tax of ten cents a pound, unless, by the proviso the oleomargarine was of such a character as to entitle it to the benefits of a lower rate of taxation. Now the proviso reads: "*Provided,* When oleomargarine is free from artificial coloration that causes it to look like butter of any shade of yellow, such tax shall be one-fourth of one cent per pound." As it was admitted that the oleomargarine was of a shade of yellow causing it to look like butter, and as it was also admitted that this shade of yellow had been imparted by an artificial coloring matter used to color the butter which formed one of the ingredients from which the oleomargarine was manufactured, it results, if the text of the statute be applied, that the oleomargarine was not within the proviso, because it was not free from artificial coloring matter causing it to look like butter. This necessarily follows, since the right to enjoy the lower rate of tax is made by the proviso to depend upon whether, as a matter of fact, the oleomargarine was free from artificial coloring matter, and not upon the mere method adopted for imparting the artificial color. As the oleomargarine in question was in fact not free from artificial col-

oration we think that a construction which would take it out of the general rule imposing the ten cent tax upon all oleomargarine, and bring it within the exception embracing only oleomargarine free from artificial coloration, would be not an interpretation of the statute, but a disregard of its unambiguous provisions.

But it is contended that, as section 2 of the act of 1886 defined oleomargarine, for the purposes of that act, to be "certain manufactured substances, certain extracts and certain mixtures and compounds, including such mixtures and compounds with butter," and as not only the act of 1886, but the act of 1902, defined butter, for the purposes of those acts, to mean "the food product usually known as butter, and which is made exclusively from milk or cream, or both, with or without common salt, and with or without additional coloring matter," therefore colored oleomargarine produced by using, as one of the ingredients of its manufacture, butter artificially colored must be treated as free from artificial coloration within the meaning of the act of 1902, and the deduction made is that, as the statute treats butter, both with or without artificial coloration, as a legitimate ingredient of oleomargarine, the use of an authorized ingredient did not cause the manufactured product to be other than oleomargarine within the statute. But the proposition goes further, and asserts that because butter, whether artificially colored or not, was an authorized ingredient of oleomargarine, therefore the finished product, in which either of these ingredients was used, was not only oleomargarine, but necessarily also was oleomargarine free from artificial coloration. This is an obvious *non sequitur*. As the benefit of the lower tax depended upon the absence from the manufactured product of artificial coloration, it follows that if in the manufacture an authorized ingredient, which was artificially colored, was used so as to artificially color the product whilst that product would be oleomargarine, it could not be oleomargarine free from artificial coloration within the intendment of the proviso. Nor is there force in the contention that the

plain meaning of the statute is overcome by an amendment to which it was subjected. Before the amendment relied on, the proviso read as follows: "Provided, when oleomargarine is free from coloration *or ingredient* that causes it to look like butter of any shade of yellow, said tax shall be one-fourth of one cent per pound." By the amendment the word ingredient was stricken out, thus leaving the proviso in the form in which it was enacted. The proposition is that the elimination of the word " ingredient" compels to the. conclusion that wherever artificial coloration in the finished product of oleomargarine was produced by artificial coloration used in an authorized ingredient, that such coloration was not artificial within the statute. But this disregards the fact that butter, both when artificially colored and when not so colored, was made an authorized ingredient of oleomargarine. If then the word " ingredient" had not been stricken out, it might have given rise to the contention that the imparting of a yellow color to the finished product of oleomargarine by the use in its manufacture of spring butter of a. natural yellow color would have caused the product oleomargarine to be artificially colored within the statute. As the manufacturer of oleomargarine was permitted to use either butter not artificially colored or butter so colored, the effect of striking out the word " ingredient" operated simply to render it certain that the finished product, even although of a yellow color, would be within the proviso where the color was imparted by an authorized ingredient not artificially colored. This overthrows the contention that the finished product, when not free from artificial coloration, must be treated as free from such coloration, because the color was derived from an artificially colored though authorized ingredient. We think, whilst the statute recognized the right of a manufacturer to use any or all of the authorized ingredients so as to make oleomargarine, and also authorized as one of the ingredients butter artificially colored, if the manufacturer elected to use such ingredient last mentioned, and thereby gave to

his manufactured product artificial coloration, such product so colored, although being oleomargarine, was not within the exception created by the proviso, and therefore came under the general rule subjecting oleomargarine to the tax of ten cents a pound.

Nor do the other provisions of the act of 1902, as it is asserted, sustain the contention that artificially colored oleomargarine is to be treated as free from such coloration, because such color was imparted in its manufacture by the use of an artificially colored and authorized ingredient. The provision principally depended upon is section 2 of the act of 1902, which provides that any person who "sells, vends or furnishes oleomargarine for the use and consumption of others, except to his own family table, without compensation, who shall *add to or mix* with such oleomargarine any artificial coloration, . . . shall also be held to be a manufacturer of oleomargarine . . ." But this section relates only to the adding to or mixing artificial coloration with oleomargarine after its manufacture, and therefore does not even remotely support the proposition that, where in the process of manufacture oleomargarine becomes artificially colored, it must be held not to be what it in fact is, that is, must be treated as free from artificial coloration, although such in fact is not the case.

Indeed, the context of the statutes, particularly the provisions as to adulterated and renovated butter in the act of 1902, harmonize with and thus add cogency to the construction which we have given to the provision concerning artificial coloration.

2d. *Did Congress in passing the acts which are assailed, exert a power not conferred by the Constitution?*

That the acts in question on their face impose excise taxes which Congress had the power to levy is so completely established as to require only statement. *Patton* v. *Brady,* 184 U. S. 608, 619 ; *Knowlton* v. *Moore,* 178 U. S. 41; *Nicol* v. *Ames,* 173 U. S. 509; *In re Kollock,* 165 U. S. 526.

The last case referred to (*In re Kollock*) involved the act of 1886, and the court, speaking through Mr. Chief Justice Fuller, said (p. 536):

"The act before us is on its face an act for levying taxes, and although it may operate in so doing to prevent deception in the sale of oleomargarine as and for butter, its primary object must be assumed to be the raising of revenue."

We might rest the answer to the contention as to the want of power in Congress to enact the laws in question upon the foregoing cases. But in view of the earnestness with which the validity of the acts is assailed in argument and the assertion that the necessary effect of the amendment to the act of 1886 by the act of 1902 is to make both of the laws in question so peculiar as to cause them to be beyond the reach of the previous rulings of this court, we propose to review and dispose of the propositions pressed upon us at bar as indubitably demonstrating that the acts in question were beyond the power of Congress to adopt.

The summary which follows embodies the propositions contained in the assignments of error, and the substance of the elaborate argument by which those assignments are deemed to be sustained. Not denying the general power of Congress to impose excise taxes, and conceding that the acts in question, on their face, purport to levy taxes of that character, the propositions are these:

(*a*) That the power of internal taxation which the Constitution confers on Congress is given to that body for the purpose of raising revenue, and that the tax on artificially colored oleomargarine is void because it is of such an onerous character as to make it manifest that the purpose of Congress in levying it was not to raise revenue but to suppress the manufacture of the taxed article.

(*b*) The power to regulate the manufacture and sale of oleomargarine being solely reserved to the several States, it follows that the acts in question, enacted by Congress for the purpose of suppressing the manufacture and sale of oleo-

margarine, when artificially colored, are void, because usurping the reserved power of the States, and therefore exerting an authority not delegated to Congress by the Constitution.

(c) Whilst it is true—so the argument proceeds—that Congress in exerting the taxing power conferred upon it may use all means appropriate to the exercise of such power, a tax which is fixed at such a high rate as to suppress the production of the article taxed, is not a legitimate means to the lawful end, and is therefore beyond the scope of the taxing power.

(d) As the tax levied by the acts which are assailed discriminates against oleomargarine artificially colored, and in favor of butter so colored, and creates an unwarranted and unreasonable distinction between the oleomargarine which is artificially colored and that which is not, and as the necessary operation and effect of the tax is to suppress the manufacture of artificially colored oleomargarine, and to aid the butter industry, therefore the acts are void. And with this proposition in mind it is insisted that wherever the judiciary is called upon to determine whether a power which Congress has exerted is within the authority conferred by the Constitution, the duty is to test the validity of the act, not merely by its face, or to use the words of the argument, "by the label placed upon it by Congress," but by the necessary scope and effect of the assailed enactment.

(e) Admitting that the power to tax as delegated to Congress by the Constitution as originally adopted was subject to no limitation except as expressed in that instrument, the amendments to the Constitution, it is urged, have imposed limitations on the taxing power not expressed in the original Constitution. Under this assumption it is insisted that the acts in question are void, because the burdens which they impose are repugnant to both the Fifth and Tenth Amendments. To the Fifth Amendment, because the amount of the tax is so out of proportion to the value of the property taxed as to destroy that property, and thus amount to a taking

thereof without due process of law. To the Tenth Amendment, because the necessary operation and effect of the acts is to destroy the oleomargarine industry and thus exert a power not delegated to Congress, but reserved to the several States.

(*f*) Although, as a general rule, it be true that the power of Congress to tax, conferred by the Constitution, is unlimited, except as otherwise expressed in that instrument, and conceding, for the sake of the argument, that there is no express limitation either in the original Constitution or in the amendments thereto, by which the acts may be decided to be unconstitutional, nevertheless, it is urged, that, as the burdens which the acts impose are so onerous and so unjust as to be confiscatory, the acts are void, because they amount to a violation of those fundamental rights which it is the duty of every free government to protect.

It is clear that these propositions in many respects not only reiterate in different forms of expression the same contention, but that they also so intermingle considerations which require separate analysis so as to cause it to be difficult to precisely determine their import. For instance, all of the propositions obviously rest not only on inferences drawn from the face of the acts, but also on deductions made from what it is assumed must have been the motives or purposes of Congress in passing them. To avoid confusion and repetition we shall consider these distinct contentions separately, and we hence come, first, to ascertain how far, if at all, the motives or purposes of Congress are open to judicial inquiry in considering the power of that body to enact the laws in question. Having determined the question of our right to consider motive or purpose we shall then approach the propositions relied on by the light of the correct rule on the subject of purpose or motive.

Whilst, as a result of our written constitution, it is axiomatic that the judicial department of the government is charged with the solemn duty of enforcing the Constitution,

and. therefore in cases properly presented, of determining whether a given manifestation of authority has exceeded the power conferred by that instrument, no instance is afforded from the foundation of the government where an act, which was within a power conferred, was declared to be repugnant to the Constitution, because it appeared to the judicial mind that the particular exertion of constitutional power was either unwise or unjust. To announce such a principle would amount to declaring that in our constitutional system the judiciary was not only charged with the duty of upholding the Constitution but also with the responsibility of correcting every possible abuse arising from the exercise by the other departments of their conceded authority. So to hold would be to overthrow the entire distinction between the legislative, judicial and executive departments of the government, upon which our system is founded, and would be a mere act of judicial usurpation.

It is, however, argued if a lawful power may be exerted for an unlawful purpose, and thus by abusing the power it may be made to accomplish a result not intended by the Constitution, all limitations of power must disappear, and the grave function lodged in the judiciary, to confine all the departments within the authority conferred by the Constitution, will be of no avail. This, when reduced to its last analysis, comes to this, that, because a particular department of the government may exert its lawful powers with the object or motive of reaching an end not justified, therefore it becomes the duty of the judiciary to restrain the exercise of a lawful power wherever it seems to the judicial mind that such lawful power has been abused. But this reduces itself to the contention that, under our constitutional system, the abuse by one department of the government of its lawful powers is to be corrected by the abuse of its powers by another department.

The proposition, if sustained, would destroy all distinction between the powers of the respective departments of the gov-

ernment, would put an end to that confidence and respect for each other which it was the purpose of the Constitution to uphold, and would thus be full of danger to the permanence of our institutions. As aptly said by the court, speaking through Mr. Justice Miller, in *Kilbourn* v. *Thompson*, 103 U. S. 168, p. 190 :

"It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers intrusted to the government, whether State or National, are divided into the three grand departments, the executive, the legislative, and the judicial. That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other."

It is, of course, true, as suggested, that if there be no authority in the judiciary to restrain a lawful exercise of power by another department of the government, where a wrong motive or purpose has impelled to the exertion of the power, that abuses of a power conferred may be temporarily effectual. The remedy for this, however, lies, not in the abuse by the judicial authority of its functions, but in the people, upon whom, after all, under our institutions, reliance must be placed for the correction of abuses committed in the exercise of a lawful power. This was aptly pointed out in *Champion* v. *Ames*, 188 U. S. 321, where, speaking through Mr. Justice Harlan, it was said (p. 363) :

"But if what Congress does is within the limits of its power, and is simply unwise or injurious, the remedy is that suggested by Chief Justice Marshall in *Gibbons* v. *Ogden*, when

he said : ' The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied, to secure them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments.' "

The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted. As we have previously said, from the beginning no case can be found announcing such a doctrine, and on the contrary the doctrine of a number of cases is inconsistent with its existence. As quite recently pointed out by this court in *Knowlton* v. *Moore*, 178 U. S. 41, 60, the often quoted statement of Chief Justice Marshall in *McCulloch* v. *Maryland*, that the power to tax is the power to destroy, affords no support whatever to the proposition that where there is a lawful power to impose a tax its imposition may be treated as without the power because of the destructive effect of the exertion of the authority. And this view was clearly pointed out by Mr. Chief Justice Marshall in the passage from *Gibbons* v. *Ogden*, 9 Wheat. 1, which was repeated in the passage from the opinion in *Champion* v. *Ames*, previously cited.

And the same doctrine has been again and again expounded. In the *License Tax Cases*, 5 Wall. 462, referring to the extensive power of taxation possessed by Congress, and the express limitations found in the Constitution, it was said (p. 471):

" It is true that the power of Congress to tax is a very extensive power. It is given in the Constitution, with only one exception and only two qualifications. Congress cannot tax exports, and it must impose direct taxes by the rule of apportionment, and indirect taxes by the rule of uniformity. Thus limited, and thus only, it reaches every subject, and may be exercised at discretion."

In *Pacific Insurance. Co. v. Soule*, 7 Wall. 433, referring to the unlimited nature of the power of taxation conferred upon Congress, it was observed (p. 443):

" Congress may prescribe the basis, fix the rates, and require payment as it may deem proper. Within the limits of the Constitution it is supreme in its action. No power of supervision or control is lodged in either of the other departments of the government."

And after referring to the express limitations as to uniformity and articles exported from any State, it was remarked (p. 446):

" With these exceptions, the exercise of the power is, in all respects, unfettered."

In *Austin* v. *The Aldermen*, 7 Wall. 694, it was again declared (p. 699) that " the right of taxation, where it exists, is necessarily unlimited in its nature. It carries with it inherently the power to embarrass and destroy."

Yet again, in *Veazie Bank* v. *Fenno*, 8 Wall. 533, where a tax levied by Congress on the circulating notes of state banks was assailed on the ground that the tax was intended to destroy the circulation of such notes, and was, besides, the exercise of a power to tax a subject not conferred upon Congress, it was said, as to the first contention (p. 548):

" It is insisted, however, that the tax in the case before us is excessive, and so excessive as to indicate a purpose on the part of Congress to destroy the franchise of the bank, and is, therefore, beyond the constitutional power of Congress.

" The first answer to this is that the judicial cannot prescribe to the legislative departments of the government limitations upon the exercise of its acknowledged powers. The power to tax may be exercised oppressively upon persons, but the responsibility of the legislature is not to the courts, but to the people by whom its members are elected. So if a particular tax bears heavily upon a corporation, or a class of corporations, it cannot, for that reason only, be pronounced contrary to the Constitution."

True it is, as argued, that the opinion in that case rested the conclusion not alone upon the doctrine just quoted, but also upon the principle that Congress possessed the power to suppress the circulation of the notes of state banks as an incident to the authority concerning the currency delegated to Congress by the Constitution. But whilst this argument may weaken the authoritative force of the statement made in the case in question as to the want of power in the judiciary to examine into motive, it does not affect the persuasive and inherent force of the reasoning by which that view was sustained. Besides, the doctrine has since been affirmed.

In *Spencer* v. *Merchant*, 125 U. S. 345, 355, speaking through Mr. Justice Gray, it was said:

" In the words of Chief Justice Chase, condensing what had been said long before by Chief Justice Marshall, 'The judicial department cannot prescribe to the legislative department limitations upon the exercise of its acknowledged powers. The power to tax may be exercised oppressively upon persons; but the responsibility of the legislature is not to the courts, but to the people by whom its members are elected.' "

In *Knowlton* v. *Moore*, 178 U. S. 41, the cases which have been referred to, were approvingly cited, and the doctrine which they expressed was restated.

In *Treat* v. *White*, 181 U. S. 264, referring to a stamp duty levied by Congress, it was observed (p. 269):

"The power of Congress in this direction is unlimited. It does not come within the province of this court to consider why agreements to sell shall be subject to the stamp duty and agreements to buy not. It is enough that Congress in this legislation has imposed a stamp duty upon the one and not upon the other."

In *Patton* v. *Brady*, 184 U. S. 608, considering another stamp duty levied by Congress, it was again said (p. 623):

"That it is no part of the function of a court to inquire into the reasonableness of the excise, either as respects the amount, or the property upon which it is imposed."

It being thus demonstrated that the motive or purpose of Congress in adopting the acts in question may not be inquired into, we are brought to consider the contentions relied upon to show that the acts assailed were beyond the power of Congress, putting entirely out of view all considerations based upon purpose or motive.

1. Undoubtedly, in determining whether a particular act is within a granted power, its scope and effect are to be considered. Applying this rule to the acts assailed, it is self-evident that on their face they levy an excise tax. That being their necessary scope and operation, it follows that the acts are within the grant of power. The argument to the contrary rests on the proposition that, although the tax be within the power, as enforcing it will destroy or restrict the manufacture of artificially colored oleomargarine, therefore the power to levy the tax did not obtain. This, however, is but to say that the question of power depends, not upon the authority conferred by the Constitution, but upon what may be the consequence arising from the exercise of the lawful authority.

Since, as pointed out in all the decisions referred to, the taxing power conferred by the Constitution knows no limits except those expressly stated in that instrument, it must follow, if a tax be within the lawful power, the exertion of that power may not be judicially restrained because of the results to arise from its exercise. The proposition now relied upon was urged in *Knowlton* v. *Moore*, 178 U. S. 41, and was overruled. In that case it was insisted that, although death duties were within the power to levy excise taxation, as the effect of their extreme enforcement would involve the power to destroy the right to the passage or receipt of property on the occasion of death—a subject within the exclusive control of the States— therefore death duties when imposed by Congress must be held to be unconstitutional. In considering this contention, after referring to the statement of Mr. Chief Justice Marshall, in *McCulloch* v. *Maryland*, that the power to tax involves the power to destroy, it was observed (p. 60):

"This principle is pertinent only when there is no power to tax a particular subject, and has no relation to a case where such right exists. In other words, the power to destroy which may be the consequence of taxation is a reason why the right to tax should be confined to subjects which may be lawfully embraced therein, even although it happens that in some particular instance no great harm may be caused by the exercise of the taxing authority as to a subject which is beyond its scope. But this reasoning has no application to a lawful tax, for if it had there would be an end of all taxation; that is to say, if a lawful tax can be defeated because the power which is manifested by its imposition may when further exercised be destructive, it would follow that every lawful tax would become unlawful, and therefore no taxation whatever could be levied."

Of course, where a state law is assailed as repugnant to the Constitution of the United States, and on its face such act was seemingly within the power of the State to adopt, but its necessary effect and operation is to usurp a power granted by the Constitution to the Government of the United States, it must follow, from the paramount nature of the Constitution of the United States, that the act is void. In such a case the result of the test of necessary operation and effect is to demonstrate the want of power, because of the controlling nature of the limitations imposed by the Constitution of the United States on the States.

And without attempting to review the numerous authorities cited in the argument, it suffices to say that we think it is apparent that they fall within one or the other of the categories just previously stated.

2. The proposition that where a tax is imposed which is within the grant of powers, and which does not conflict with any express constitutional limitation, the courts may hold the tax to be void because it is deemed that the tax is too high, is absolutely disposed of by the opinions in the cases hitherto cited, and which expressly hold, to repeat again the language

of one of the cases, (*Spencer* v. *Merchant*,) that " The judicial department cannot prescribe to the legislative department limitations upon the exercise of its acknowledged powers. The power to tax may be exercised oppressively upon persons; but the responsibility of the legislature is not to the courts, but to the people by whom its members are elected."

3. Whilst undoubtedly both the Fifth and Tenth Amendments qualify, in so far as they are applicable, all the provisions of the Constitution, nothing in those amendments operates to take away the grant of power to tax conferred by the Constitution upon Congress. The contention on this subject rests upon the theory that the purpose and motive of Congress in exercising its undoubted powers may be inquired into by the courts, and the proposition is therefore disposed of by what has been said on that subject.

The right of Congress to tax within its delegated power being unrestrained, except as limited by the Constitution, it was within the authority conferred on Congress to select the objects upon which an excise should be laid. It therefore follows that, in exerting its power, no want of due process of law could possibly result, because that body chose to impose an excise on artificially colored oleomargarine and not upon natural butter artificially colored. The judicial power may not usurp the functions of the legislative in order to control that branch of the government in the performance of its lawful duties. This was aptly pointed out in the extract heretofore made from the opinion in *Treat* v. *White*, 181 U. S. 264.

But it is urged that artificially colored oleomargarine and artificially colored natural butter are in substance and in effect one and the same thing, and from this it is deduced that to lay an excise tax only on oleomargarine artificially colored and not on butter so colored is violative of the due process clause of the Fifth Amendment, because, as there is no possible distinction between the two, the act of Congress was a mere arbitrary imposition of an excise on the one article and not on the other, although essentially of the same class. Conceding merely for

the sake of argument that the due process clause of the Fifth Amendment, would avoid an exertion of the taxing power which, without any basis for classification, arbitrarily taxed one article and excluded an article of the same class, such concession would be wholly inapposite to the case in hand. The distinction between natural butter artificially colored, and oleomargarine artificially colored so as to cause it to look like butter, has been pointed out in previous adjudications of this court. *Capital City Dairy Co.* v. *Ohio*, 183 U. S. 238, and authorities there cited. Indeed, in the cases referred to the distinction between the two products was held to be so marked, and the aptitude of oleomargarine when artificially colored, to deceive the public into believing it to be butter, was decided to be so great that it was held no violation of the due process clause of the Fourteenth Amendment was occasioned by state legislation absolutely forbidding the manufacture, within the State, of oleomargarine artifically colored. As it has been thus decided that the distinction between the two products is so great as to justify the absolute prohibition of the manufacture of oleomargarine artificially colored, there is no foundation for the proposition that the difference between the two was not sufficient, under the extremest view, to justify a classification, distinguishing between them.

4. Lastly we come to consider the argument that, even though as a general rule a tax of the nature of the one in question would be within the power of Congress, in this case the tax should be held not to be within such power, because of its effect. This is based on the contention that, as the tax is so large as to destroy the business of manufacturing oleomargarine artificially colored, to look like butter, it thus deprives the manufacturers of that article of their freedom to engage in a lawful pursuit, and hence, irrespective of the distribution of powers made by the Constitution, the taxing laws are void, because they violate those fundamental rights which it is the duty of every free government to safeguard, and which, therefore, should be held to be embraced by im-

plied though none the less potential guaranties, or in any event to be within the protection of the due process clause of the Fifth Amendment.

Let us concede, for the sake of argument only, the premise of fact upon which the proposition is based. Moreover, concede for the sake of argument only, that even although a particular exertion of power by Congress was not restrained by any express limitation of the Constitution, if by the perverted exercise of such power so great an abuse was manifested as to destroy fundamental rights which no free government could consistently violate, that it would be the duty of the judiciary to hold such acts to be void upon the assumption that the Constitution by necessary implication forbade them.

Such concession, however, is not controlling in this case. This follows when the nature of oleomargarine, artificially colored to look like butter, is recalled. As we have said, it has been conclusively settled by this court that the tendency of that article to deceive the public into buying it for butter is such that the States may, in the exertion of their police powers, without violating the due process clause of the Fourteenth Amendment, absolutely prohibit the manufacture of the article. It hence results, that even although it be true that the effect of the tax in question is to repress the manufacture of artificially colored oleomargarine, it cannot be said that such repression destroys rights which no free government could destroy, and, therefore, no ground exists to sustain the proposition that the judiciary may invoke an implied prohibition, upon the theory that to do so is essential to save such rights from destruction. And the same considerations dispose of the contention based upon the due process clause of the Fifth Amendment. That provision, as we have previously said, does not withdraw or expressly limit the grant of power to tax conferred upon Congress by the Constitution. From this it follows, as we have also previously declared, that the judiciary is without authority to avoid an act of Congress exerting the taxing power, even in a case where to the judicial mind

it seems that Congress had in putting such power in motion abused its lawful authority by levying a tax which was unwise or oppressive, or the result of the enforcement of which might be to indirectly affect subjects not within the powers delegated to Congress.

Let us concede that if a case was presented where the abuse of the taxing power was so extreme as to be beyond the principles which we have previously stated, and where it was plain to the judicial mind that the power had been called into play not for revenue but solely for the purpose of destroying rights which could not be rightfully destroyed consistently with the principles of freedom and justice upon which the Constitution rests, that it would be the duty of the courts to say that such an arbitrary act was not merely an abuse of a delegated power, but was the exercise of an authority not conferred. This concession, however, like the one previously made, must be without influence upon the decision of this cause for the reasons previously stated; that is, that the manufacture of artificially colored oleomargarine may be prohibited by a free government without a violation of fundamental rights.

*Affirmed.*

The CHIEF JUSTICE, MR. JUSTICE BROWN and MR. JUSTICE PECKHAM dissent.