**FOLEY v. MILLER, Collector of Internal Revenue, et al.**

District Court, S. D. Ohio, E. D. February 28, 1928.

No. 2553.

1. **Internal revenue ☞38(12)—Burden was on oleomargarine seller, suing for tax paid, to show that product was free from artificial coloration, within statutory proviso imposing smaller tax (Oleomargarine Act 1886, § 8, as amended by Act May 9, 1902, § 3 [26 USCA § 546]).**

In action to recover tax of 10 cents per pound, assessed against seller of oleomargarine under Oleomargarine Act Aug. 2, 1886, § 8, as amended by Act May 9, 1902, § 3 (26 USCA § 546; Comp. St. § 6220), burden was on plaintiff to show that product was within proviso imposing tax of only one-fourth of cent per pound on oleomargarine free from artificial coloration to look like butter.

2. **Internal revenue ☞16—Oleomargarine containing ingredients used in substantial amounts for other purposes than coloration is within statutory proviso imposing smaller tax on oleomargarine free from artificial coloration (Internal Revenue Regulations No. 9, § 43[6], [c]; Act May 9, 1902, § 3, amending Oleomargarine Act 1886, § 8 [26 USCA § 546]).**

In view of Internal Revenue Regulations No. 9, § 43, (b), (c), as revised in August, 1925, and discussion before Senate committee when Act May 9, 1902, § 3, amending Oleomargarine Act Aug. 2, 1886, § 8 (26 USCA § 546; Comp. St. § 6220), was under consideration, permissible oleomargarine ingredients, used in substantial amounts for other purposes than coloration, are within proviso of latter section imposing smaller tax on oleomargarine free from "artificial coloration," particularly when carrying recognized food value and lending body and texture to mass.

3. **Statutes ☞188—Courts must attribute ordinary meaning to words of statute, in absence of precedent or apparent manifest intent.**

In absence of guiding precedent or expressed apparent manifest intention, court must attribute ordinary meaning to words used in statute.

4. **Internal revenue ☞16—"Artificial coloration," in statute taxing oleomargarine, is opposite of "natural coloration;" "artificial;" "coloration" (Act May 9, 1902, § 3, amending Oleomargarine Act 1886, § 8 [26 USCA § 546]).**

"Artificial coloration," as used in Act May 9, 1902, § 3, amending Oleomargarine Act Aug.

2, 1886, § 8 (26 USCA § 546; Comp. St. § 6220), by imposing tax of only one-fourth of cent per pound on oleomargarine free from such coloration, is counterpart and opposite of "natural coloration," which means colored naturally, without using human skill or labor; "coloration" being a noun, meaning state of being colored, while "artificial" is qualifying adjective, meaning produced or modified by human skill or labor.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Artificial; Coloration; Second Series, Artificial Coloration.]

5. **Internal revenue ☞16—Production of yellow color by treatment of cotton seed and cocoanut oils, constituting 24 per cent. of oleomargarine, held not "artificial coloration," within statute imposing smaller tax on oleomargarine free therefrom (Act May 9, 1902, § 3, amending Oleomargarine Act 1886, § 8 [26 USCA § 546]).**

Production of yellow color by treatment of cotton seed and cocoanut oils, representing 24 per cent. of formula for oleomargarine, *held* not "artificial coloration," within Act May 9, 1902, § 3 amending Oleomargarine Act Aug. 2, 1886, § 8 (26 USCA § 546; Comp. St. § 6220), by imposing tax of only one-fourth of cent per pound on oleomargarine free from such coloration.

At Law. Action by A. E. Foley against Newton M. Miller, Collector of Internal Revenue, and others. Judgment for plaintiff.

R. W. Childs, of Chicago, Ill., and James A. Allen, of Columbus, Ohio, for plaintiff.

Haveth E. Mau, Dist. Atty., and Simon Ross, Asst. Dist. Atty., both of Cincinnati, Ohio, for defendants.

HOUGH, District Judge. This is an action by which the plaintiff, a groceryman, licensed to sell "oleomargarine free from artificial coloration to look like butter of any shade of yellow," seeks to recover from the collector of internal revenue the sum of $44, which was assessed against him, on the ground that certain oleomargarine which he had and offered for sale was not free from artificial coloration.

A jury was waived in writing, and the case was tried to the court. The formal allegations of the petition were admitted to be true, and the contested issue resolves itself into whether the product in question is subject to a tax of 10 cents per pound, under section 8 of the Oleomargarine Law, Act Aug. 2, 1886, amended by Act May 9, 1902, as claimed by the collector, or whether it be subject to a tax of one-fourth of 1 cent per pound, under the proviso contained in section 8 of said act, as claimed by the plaintiff.

It is conceded that the product which

was assessed the 10-cent tax, amounting to $44, is represented by the sample which appears in this case as Exhibit No. 1, and it has been shown that Exhibit No. 1 was manufactured under a formula made up of the following ingredients, to wit: 240 pounds, or 30 per cent., high-colored oleo oil (Exhibit 2); 88 pounds, or 11 per cent., white neutral; 120 pounds, or 15 per cent., high yellow cotton seed oil (Exhibit 4); 96 pounds, or 12 per cent., hydrogenated yellow cotton seed oil (Exhibit 7); 96 pounds, or 12 per cent., hydrogenated cocoanut oil (Exhibit 8); 80 pounds, or 10 per cent., high yellow soy bean oil (Exhibit 9); 80 pounds, or 10 per cent., natural pale yellow oleo stock (Exhibit 10). To this combination subsequently was added 400 pounds of milk and 3½ per cent. salt.

It is further conceded that all the above ingredients were permissible and allowable ingredients under the statute defining oleomargarine. That definition also permitted and allowed as ingredients "vegetable oils, amatto and other coloring matter."

Prior to the amendment of May 9, 1902, the law provided for a tax of 2 cents per pound upon oleomargarine, irrespective of color or coloring, but by the amendment imposed as a substitute a tax of one-fourth of a cent per pound on oleomargarine free from "artificial coloration" causing it to resemble butter, or otherwise a tax of 10 cents per pound, providing therefor in the following language:

"That upon oleomargarine which shall be manufactured and sold or removed for consumption or use, there shall be assessed and collected a tax of 10 cents per pound to be paid by the manufacturer thereof: * * * Provided, when oleomargarine is free from artificial coloration that causes it to look like butter of any shade of yellow, said tax shall be one-fourth of 1 cent per pound."

It is further conceded, or at least not disputed, that all the ingredients used in the product, save and except the hydrogenated cotton seed oil and the hydrogenated yellow cocoanut oil, are such ingredients as would entitle the product to come under the proviso of the amendment and assessable at the lower rate of tax.

The government's claim is, through its officer, the collector, that the hydrogenated yellow cotton seed and cocoanut oils, representing together 24 per cent. of the formula, are not "free from artificial coloration that causes it to look like butter of any shade of yellow." If this be true, of course, it subjects the product containing such ingredients to the higher tax. The character and treatment of these two ingredient oils, prior to their reception into the formula and thereafter, and the statutory classification into which properly to place them, is the problem for decision.

[1] The burden of proof is upon the plaintiff to maintain his issue, and is also upon him to show that the product comes under the proviso contained in the amendment. The proof discloses that the treatment given the two oils is identical, so that a discussion of the various stages of refinement and processing of the cotton seed oil will answer for both.

This oil is taken in its crude or raw state, being the result of pressing the liquid oil from the cotton seed (Plaintiff's Exhibit No. 5). It is then subjected to a refining process, to take out the impurities and foreign matter and more or less deodorize it, producing a deep yellow or amber liquid (Plaintiff's Exhibit No. 4) from the crude condition, which is a very dark brown color. It will be noticed that this refined liquid is of itself a constituent component of the formula.

The next process is that of hydrogenation, which is a semisolidification of the liquid, and produces a colorless or creamy white semisolid (Plaintiff's Exhibit No. 12). This result is said to produce a valuable and desirable food ingredient, and to contribute body and texture to the whole mass.

The next and last process, represented by Plaintiff's Exhibit No. 7, produces as is shown to the naked eye a perhaps increased solidity to the mass, but also, according to the testimony of the witnesses, a reinstatement or recovery, or bringing out or back, the indigenous, inherent, and latent yellow color that was in it, and that disappeared to the naked eye by reason of the next preceding process (Plaintiff's Exhibit No. 12). The latter process is described by applying what in chemical science is known as "inducing agents"; that is, the natural agencies of vacuum, heat, and agitation.

The chemist, who is the inventor of the formula and also of this latter process of restoring the yellow color, testifies that the restoration of the color is caused by molecular rearrangement, thus re-establishing a yellow color, though of a somewhat different appearance to the eye than had been apparent in Plaintiff's Exhibit No. 4 and lost to visibility in Plaintiff's Exhibit No. 12. He admits that this is unprovable in the science, but says that it is a well-grounded and a generally accepted theory. This last result re-

tains all the food value, contributes as much body and texture to the whole mass, adds more flavor, and restores color, as compared with the result of the next last process (Plaintiff's Exhibit No. 12).

The two oils under discussion thus treated are also introduced as a substitute for the yellow oleo stock. Oleo stock is produced from selected fat, yellow in color, from selected beef, and has long been known as a constituent component of oleomargarine. The supply, however, is limited, and is said to be seasonal, and independent manufacturers have difficulty in obtaining it, especially at certain times of the year, for the reason that the packers control the supply and are also usually manufacturers of oleomargarine. These facts make the substitute, not only cheaper, but also desirable, because unlimited.

The two substitute oils thus processed, to obtain texture and body equivalent to the texture and body contained in oleo stock, are introduced and used in substantial quantities, making up a total of 24 per cent. of the entire mass. These ingredients, no claim to the contrary being advanced, may be considered, also, as contributing wholesome food value to the final product.

[2] The law as it exists in its present state, and as above described, has been under consideration by the Supreme Court of the United States in at least three cases. In the case of McCray v. U. S., 195 U. S. 27, 24 S. Ct. 769, 49 L. Ed. 78, that court had before it a formula in which colored butter was used as one of the component parts of the product, and the court held that, while butter of a shade of yellow was a permissible ingredient under the statute in oleomargarine, butter artificially colored by the addition of coloring matter contributed coloring matter to the final result, and therefore did not allow the finished oleomargarine to come under the proviso subjecting it to the lower rate of tax, for the reason that the result obtained was not "free from artificial coloration that causes it to look like butter of any shade of yellow."

The next expression in point of time is found in the case of Cliff v. U. S., 195 U. S. 159, 163, 164, 25 S. Ct. 1, 2 (49 L. Ed. 139). In that case the formula contained a highly colored yellow palm oil, a vegetable oil, of 1½ ounces out of 160 ounces in the whole mass, or in proportion about one-half of 1 per cent. of the whole. The court found that the product was not entitled to the lower tax rate, because the insignificant quantity of palm oil in comparison added nothing substantial to the product for any pur-

pose other than coloring, and that this ingredient came under the classification "vegetable oils, amatto or other coloring matter," and therefore was not free from "artificial coloration." Such a conclusion arises from the following language of the court:

"But in this enumeration Congress included, not only those substances which entered into the composition of oleomargarine, make it suitable for food, and, so to speak, form its body, but also others used only for coloring. After naming some, it adds specifically, 'and other coloring matter.' The purpose in so including 'coloring matter' is obvious. It was to prevent excluding from the operation of the statute anything in its nature oleomargarine by the addition of a substance not in reality an ingredient, but serving substantially only the purpose of coloring the product to cause it to look like butter. The fact that one of the ingredients of this compound is palm oil does not show that such oil does anything else than color the product composed of other ingredients, and if it does substantially only this it is rightfully styled an artificial coloration. * * * Bearing in mind, also, that one of the purposes of this legislation was to prevent the sale of oleomargarine as and for butter, it must be held that when any substance, although named as a possible ingredient of oleomargarine, substantially serves only the function of coloring the mass, and so as to cause the product to 'look like butter of any shade of yellow,' it is an artificial coloration."

In the case of Moxley v. Hertz, 216 U. S. 344, 30 S. Ct. 305, 54 L. Ed. 510, the court, having substantially the same set of facts before it, affirmed the holding in the Cliff Case, supra, and on pages 356 and 357 (30 S. Ct. 308) say:

"The question here is whether we shall exaggerate a slight use of a 'statutory ingredient' into a substantial use of it, and by doing so bring its use within the permission of the statute, and relieve the product of which it is a 'slight' part from a tax of 10 cents. * * * But the contention contravenes the rule in the Cliff Case, where the distinction was made between the mere addition of an authorized food ingredient and its service in the compound for something more substantial than coloration. We now repeat it. Any other rule would give too easy a way to evade the statute and make its purpose yield, not to what is essential to the manufacture of oleomargarine, but what is nonessential, and render a law which was intended to prevent deception an easy means to accomplish it."

In interpreting a statute of Ohio to prevent the adulteration of vinegar, the Supreme Court of the state, in the case of Weller v. State, 53 Ohio St. 77, 40 N. E. 1001, came to a like conclusion, wherein it held that, in the manufacture of vinegar formed from fermented grain, where previously to its acetification it is passed through roasted malt, not for the purpose of adding any substantial ingredient to the vinegar, but for the purpose of giving it color, as well as aroma and flavor, and without this treatment it would be colorless, the vinegar so produced contained artificial coloring matter within the meaning of the act.

Counsel for the plaintiff contends that the converse of the interpretation announced in the above cases is true, when the questioned ingredients are used in substantial amounts, and particularly when carrying recognized food value and lending body and texture to the mass. We conclude that this is a logical deduction for two reasons, namely:

(1) A construction of the internal revenue regulations in force governing this subject would seem to so indicate. Section 43 of Regulations No. 9, revised August, 1925, has for its subject "artificial coloration." Subsection (c) provides that, where an ingredient is used ostensibly as a component part, but in fact in smaller minute quantities for the primary purpose of causing oleomargarine to look like butter, the product is artificially colored and subject to the higher tax. But in subsection (b) the converse is provided, wherein it is said: "The use of naturally colored ingredients in the manufacture of oleomargarine, which have the effect of imparting to the finished product a yellow color in imitation or semblance of butter, will not be regarded as causing artificial coloration, if such ingredients form a bona fide food component part of the manufactured article and serve substantially functions other than producing color."

(2) The discussion before the committee of the Senate, when the language of the amendment was under consideration, bears out the same theory. The amendment as offered contained the words "ingredient or coloration." The debate took the form of the argument that, unless the word "ingredient" were stricken out, all ingredients having a natural shade of yellow would be eliminated, including natural butter itself, and that the force of the amendment would be nullified, for the reason that oleomargarine could not be manufactured that would be subject to the lower tax. The result was that "ingredient or" was stricken out, and the adjective "artificial" was substituted therefor. That was the origin of the term "artificial coloration."

There is also some foundation for the belief, considering the original text of the amendment, the debate thereunder, and the final substitution of "artificial" for "ingredient or," that Congress, in the expression "artificial coloration," was dealing with coloring matter, and that the proviso was intended to specify and permit the lesser tax rate to apply, when the included coloring matter enumerated in the permissible ingredients, described in the statute as 'vegetable oils, amatto or other coloring matter," were absent from the compound.

In all the cases referred to herein the courts were dealing with what in each case had been found and determined to be coloring matter—the adding to and mixing with the mass a separate and independent something used for the primary purpose of contributing coloring. This is illustrated by the text of the opinion in the Cliff Case, wherein it is said on page 164 of 195 U. S. (25 S. Ct. 3): "That when any substance, although named as a possible ingredient of oleomargarine, substantially serves only the function of coloring the mass, and so as to cause the product to 'look like butter of any shade of yellow,' it is an artificial coloration."

[3] May it be said, then, as a logical deduction, that when any substance, named as a possible ingredient for oleomargarine, substantially serves other functions than that of coloring the mass, it would not be artificial coloration?

Such an interpretation, predicated on the thus limited meaning of artificial coloration, would, of course, dispose of this case; but is there authority so to do? The Supreme Court has not so limited it in the cases discussed, because no question of a broader meaning was before it. Only what had been found to be coloring matter was interpreted to be artificial coloration. Without guiding precedent or expressed apparent manifest intention, this court must attribute to the words used their ordinary meaning.

[4] "Coloration," as used in the context of the statute, is a noun, meaning the state of being colored. "Artificial," as used, is a qualifying adjective, and means produced or modified by human skill or labor, in opposition to natural. "Artificial coloration" is to be distinguished by being the counterpart to and opposite of "natural coloration." The latter means colored naturally, or without

the use of human skill or labor to create the color.

[5] The four processes used to produce the ingredient from the cotton seed to the result obtained in the sample (Exhibit 7) are each brought about by the employment of human skill or labor. In the application of the skill or labor, is color created?

The plaintiff's witnesses say, "No." We have first the seed, which is pressed into the raw or crude oil, dark brown in aspect. This is then refined by taking out the impurities, and gives a clear, yellow liquid oil, as shown in Exhibit 5. Hydrogenation solidifies the oil, producing a creamy white, salvy result (Exhibit 12), which is said to retain the inherent yellow color, but, by the molecular rearrangement, the color sensation upon the eye is substantially devoid of definite yellow impression. At this point it is interesting to note that slight application of heat to the sample will gradually bring back a yellow tint, and soon a definite yellow color. Continuing the heat to the melting point, the matter breaks down into a liquid of the consistency and color of the refined oil before hydrogenation. Upon being cooled and chilled, solidification takes place and the yellow color remains.

The last process produces a semisolid yellow product, which in appearance is very much like the chilled oil just mentioned. During these various stages nothing is added or taken away, except the residuary impurities and solids resulting from the pressing of the seed and the refining of the raw oil. The processes are natural ones. The theory of molecular rearrangement is old, not provable, but generally recognized in the science. The government chemist does not dispute the theory, although recognizing it to be unprovable.

The last process may be said to be for the paramount purpose of coloration, and according to the evidence in this case, of restoring color, but not producing it.

Then, sustaining the molecular theory, we have a natural oil subjected by human skill and labor and by natural processes producing an ingredient, which by the means employed has preserved the inherent color. The yellow color obtained from the creamy color is no more artificial coloration, under the intendment of Congress, than the yellow color obtained from the dark brown color of the raw oil. Both stand upon the same basis, and may be classified under the head of natural coloration as distinguished from artificial coloration.

Judgment may enter for the amount prayed for in the petition.