## MacMILLAN et al. v. RAILROAD COMMISSION OF TEXAS et al.
### No. 390.

District Court, W. D. Texas, Austin Division.
July 28, 1931.

Saye, Smead, Wilson & Saye, of Longview, Tex., for plaintiffs.

C. L. Black, of Austin, Tex., amicus curiæ.

James V. Allred, Atty. Gen., and Maurice Cheek and Fred Upchurch, Asst. Attys. Gen., for Railroad Commission.

Marion S. Church, of Dallas, Tex., and Robert E. Hardwicke, of Fort Worth, Tex., for defendant Capers.

Conard E. Cooper, of Tulsa, Okl., amicus curiæ.

Before HUTCHESON, Circuit Judge, and WEST and BRYANT, District Judges.

HUTCHESON, Circuit Judge.

This is a suit brought by citizens of another state against the railroad commission of Texas, seeking to have declared unreasonable, unjust, and void, and to restrain the enforcement of, an order of the commission issued by that body in April, 1931, as a part of a program first entered upon by it in August, 1930, to put into effect, in the oil fields of Texas, the plan of operation referred to in this suit and generally as "Proration."

Plaintiff Alfred MacMillan, trustee, alleges himself to be the owner and operator of certain oil, gas, and mineral leases in Gregg and Rusk counties, in what is known as the East Texas oil fields. That his wells there are capable of producing 50,000 barrels of oil a day. That he has contracted with his coplaintiff, MacMillan Petroleum Company, the owner of oil refineries, pipe line systems, and other facilities in various fields, to sell them large quantities of oil, and that company has in turn contracted with others for delivery to them of large quantities of oil, interstate and foreign.

He alleges that he is operating his properties skillfully and in such manner as to prevent waste, and to cause no injury to producing sands of adjoining properties. That he has been ordered by the railroad commission, upon pain of penalties and contempt actions, to desist from operating his wells as he is now operating them, and to reduce the production therefrom to 1,455 barrels daily. That to do so would injure his wells, prevent his complying with the drilling obligations of his leases, thus subjecting him to suit for damages for cancellation, and would prevent his complying with his contracts for sale of the oil, subjecting him to heavy resulting losses.

He asserts that the order is void, because (1) depriving plaintiffs of their properties without due process of law, and denying them the equal protection of the laws; (2) it impairs the obligations of contracts entered

into by them; (3) it is an interference with interstate commerce; (4) the order rests not upon legislative authority or direction, and has no relation to the conservation of resources or the prevention of their waste, but is a mere arbitrary order designed to control the output, price, and market of crude oil by reducing the supply of oil to the demand for it.

Plaintiffs further allege that these orders are being enforced against all operators in the East Texas field; that they are disastrously affecting market conditions in the field; and that adequate relief for plaintiffs requires that the orders be enjoined as to all operators in the field. It further alleges that plaintiffs sue for themselves and all others similarly situated who will join therein. The bill concludes with a prayer for temporary injunction pending suit, and for permanent injunction upon final hearing.

Upon the filing of the bill in the Austin division of the Western district of Texas, the statutory court was formed and the matter came on for hearing before that court on the application for temporary injunction. That hearing was continued until June 24, at which time upon the understanding that the court might act upon the application for temporary injunction before it reached its decision on the merits, the matter was on full proofs submitted to the court both on the application for temporary injunction, and on the merits.

By these proofs plaintiff established substantially as alleged. the facts as to his ownership and operation under leases, of the properties in question, the contracts for sale of oil therefrom, interstate and foreign, the fact that the properties were being operated carefully and efficiently, and apart from the proration theory, in accordance with approved operating methods, without injuring the sands of his neighbors. That he was keeping the actual output of his wells greatly below their potential. That the commission's umpire had given him notice to reduce his production of oil to the amount alleged.

He specifically established the setting on foot by the commission, in conjunction with committees of oil operators, of the proration plan, and the issuance of proration orders for the state of Texas, and for the East Texas oil fields as alleged. He further established in an overwhelming way by the recitations in the orders of the commission of August 14 and November 24, 1930, January 23, April 4, April 22, and April 29 of 1931, by the testimony of Terrell, chairman of the railroad commission, and of members of the oil proration committees, local and central advisory, by the testimony of each witness who took the stand, and by the letter of R. D. Parker, chief supervisor, oil and gas division of the railroad commission of the state of Texas,[1] that both the occasion and the compelling reasons for the establishment by the railroad commission of proration, originally and as now continued, were the disrupted and disorderly state of the oil business through the menace of overproduction.

The evidence offered by plaintiffs and by defendants made it plain that the real genesis of the plan and of the orders in question is to be found, and that they find their effective working only, in coping with market demand.

That while the proration orders for East Texas were not based openly, as elsewhere, on nominations by oil purchasers as to the amount of oil they would agree to buy, they were in fact, though covertly, based upon the same compelling consideration, the drastic reduction of output so as to bring it into relation with market demand. The commission set about to accomplish this result in that field:

---

[1] "Railroad Commission of Texas
"Austin, Texas, May 23, 1931
"To All Purchasers and Transporters of Crude Oil in the East Texas Fields:
"To anyone acquainted with the situation in the East Texas District it seems inevitable that present conditions cannot continue long without completely breaking up proration with consequent disastrous results.
"Several things if done would insure success and we confidently believe can and must come from the purchasers and transporters of crude who handle the bulk of the production of Texas. Believing this, we insistently urge prompt action in the form of fair offers to buy prorated oil in substantial amounts and as near the posted price as possible and on that stabilized basis only, and immediate offers to make the necessary connections to take the oil. The effect of such a course is plain. Some purchasers have been holding back we understand, to see whether proration is going to work, or for some such reason or fear. It is manifest that if a substantial number stand and wait, the movement must certainly fail for want of support.
"We also earnestly request of purchasing companies that only oil be purchased which has been produced in conformity with the Commission's order governing proration in East Texas, and we ask that transporting companies refuse to handle any oil not produced strictly in accordance with the provisions of our order.
"The Railroad Commission, hoping to be of real constructive public service, has given its support to proration as an official duty to perform, and will continue to do so until forced by circumstances to abandon hope of success. We urge you therefore to promptly and effectively move at once or we will be forced to admit failure and abandon the whole plan in Texas.
"Railroad Commission of Texas
"By R. D. Parker, Chief Supervisor,
Oil & Gas Division."

(1) By fixing a low allowable production for each owner, not per well, but per unit of twenty and forty acres, in effect allowing the same production from each unit, whether it had one or ten wells upon it. Thus with one stroke the commission limited the output from existing wells, and prevented further development by, in the language of one of defendants' counsel, "treating the owner as if he were a fool for having drilled four wells, where one would be enough."

(2) After the fixing of the arbitrary allowable for the field, as one of the witnesses testified, "so low as definitely to be on the safe side," the commission set on foot a supplicatory campaign among the purchasers and transporters of East Texas oil, earnestly entreating purchasers to buy proration oil in substantial quantities, and the purchasers and transporters to boycott all producers not complying with the commission's order. Parker's letter, Note 1, supra.

Plaintiff further established that though there was evidence that the proration plan of ratable and moderate withdrawals would, if properly applied, have some effect to prolong the life of a field by delaying the intrusion of water and thus to enable more oil ultimately to be obtained, in the light of present knowledge this was largely theory and speculation, and that such plan could only be properly applied in each field after careful test and experimentation there.

Plaintiff established that the allowable for the East Texas fields was fixed at an arbitrary basis, arrived at without test or experimentation, either on plaintiff's property or in the field generally, as to the amount that might be safely withdrawn by each owner from his property without causing any physical waste. He made it clear that the allowable had been fixed arbitrarily and that therefore the plan so adopted and promulgated had the same relation to physical waste as an order not pinching in, but shutting the wells down absolutely would have, differing from such an order not in kind, but only in degree. That the plan was therefore bound to result in arbitrarily depriving plaintiffs of the right to produce their oil in accordance with their prudent judgment and desire, without any precedent finding having been made that the amount which plaintiffs desired to produce would actually cause physical waste. Plaintiffs, in short, established that the only kind of waste which the orders are designed to and do deal directly with, is economic waste, the loss of market price because of market glut. That such effect,

if any, as they might have to prevent not economic, but physical waste, does not come fairly within the purpose or effect of the order, but is a purely accidental incident thereto.

It would serve no useful purpose to burden this opinion with a summary of the evidence upon which these conclusions rest, for it in faithful detail but follows that given in hearing after hearing before committees, public bodies, and courts in the oil producing states of this country and daily appearing in countless articles and interviews, inspired and uninspired, upon the condition of the oil industry. Indeed, so importantly has this policy of proration as the cure for market glut been advanced, so currently and so widely debated as a matter of public concern has the necessity for its adoption been, so known to every man, that this court could fairly have taken judicial cognizance of the matters disclosed by the evidence; that with supply both actual and potential outrunning present demand, those interested in the oil business in this state not only financially, but as a matter of public and general concern have been first by private agreement, and latterly by invoking the aid of the commission, endeavoring to put into effect for the purpose of limiting the supply, some plan of operation which in a way most acceptable to the operators generally, will effect curtailment, and that a general consensus of opinion in Texas has latterly centered upon "proration" as the means effective to this end.

It remains to inquire whether, under the facts found, the proration orders in question are invalid, either as an attempt to exercise authority not granted by the Legislature, or, if resting on legislative grant, whether they are unjust, unreasonable, and void because violative of the constitutional guaranties to which plaintiffs appeal, or because constituting an unlawful interference with interstate commerce.

A word as to the commission, the source and terms of its authority, and as to the nature and character of a suit against it, will serve to clearly point the basis of our decision.

 Created originally for the regulation of railway rates and practices, with authority to make rules, regulations, and orders regarding same, its jurisdiction has been latterly extended by act of the Legislature to the production and transportation of oil and gas. Its rules, orders, and regulations while carrying prima facie validity, are yet subject to inquiry at the suit of persons believing

themselves aggrieved, the statute, article 6036b, providing: "If any person * * * at interest be dissatisfied with any rule, regulation or order adopted by the Commission in pursuance of the provisions of this Act such dissatisfied party may file a petition setting forth the particular cause of objections thereto in a Court of competent jurisdiction in Travis County against the Commission as defendant. Said action * * * shall be tried and determined as other Civil cases in said Court. * * * In all trials under this Section the burden of proof shall rest upon the plaintiff."

Plaintiff's suit, then, is not a class suit, but one under the statute in his own behalf, which he is entitled to maintain in the District Court of the United States for the Western District of Texas for relief against the proration orders in question, if they are, as to plaintiff, unreasonable and unjust. Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 S. Ct. 1047, 38 L. Ed. 1014.

The laws of the state of Texas, enacted to conserve the oil and gas resources of the state, are the source of the commission's power to make and enforce the orders in question, and to them we must look. Those portions of the statutes pertinent here, defining waste, enjoining the conservation of oil and gas, vesting the commission with authority over persons drilling and operating oil wells in Texas, and authorizing it to make rules and regulations for the conservation of oil and gas, and the prevention of waste thereof, are articles 6014,[2] 6023,[3] and 6029.[4]

Under the authority of these statutes, the railroad commission has occupied the field assigned to it by making specific rules and regulations governing the drilling for, the production, and transportation of oil and gas with a view to preventing waste, as defined in the statutes, and injury to the lands of adjoining owners, and these rules, practices, and regulations have been quite uniformly sustained. Oxford Oil Co. v. Atlantic Oil Co. (C. C. A.) 22 F.(2d) 597; Humble Oil Co. v. Strauss (Tex. Civ. App.) 243 S. W. 528; Gilmore v. Straughan (Tex. Civ. App.) 10 S.W.(2d) 589; State v. Jarmon (Tex. Civ. App.) 25 S.W.(2d) 936; Railroad Commission of Texas v. Bass (Tex. Civ. App.) 10 S.W.(2d) 586.

Plaintiffs point to the fact that the statutes of Texas have not authorized, but have forbidden, the consideration in conservation orders of economic waste, and that no statute has undertaken to authorize as a legitimate method to prevent physical waste, proration, or any similar plan. They declare that while the commission undoubtedly has authority to make reasonable rules and regulations having a real and direct relation to the conservation of oil and gas, and the prevention of waste, which though limiting the owner in the use of his property are designed for and effective to carry out the legislative will, the proration orders in question are not such orders. That they were not promulgated to carry out the legislative policy as declared in the statutes, and are therefore not commands of a sovereign state, but merely voluntary attempts on the part of the commission, in association with oil producers,

---

[2] Art. 6014. "*Waste*.—Neither natural gas nor crude petroleum shall be produced, transported, stored or used in such manner or under such conditions as to constitute waste; provided, however, this shall not be construed to mean economic waste. The term "*waste*" in addition to its ordinary meaning, shall include permitting (a) escape into the open air of natural gas except as may be necessary in the drilling or operation of a well; (b) drowning with water of any stratum capable of producing oil or gas or both oil and gas in paying quantities; (c) underground waste; (d) any natural gas well to wastefully burn; (e) the wasteful utilization of natural gas; (f) the creation of unnecessary fire hazards."

[3] Art. 6023. "*Jurisdiction*.—Power and authority are hereby conferred upon the Railroad Commission of Texas, over all common carrier pipe lines conveying oil or gas in Texas, and over all oil and gas wells in Texas, and over all persons, associations or corporations owning or operating pipe lines in Texas, and over all persons, associations and corporations owning or engaged in drilling or operating oil or gas wells in Texas; and all such persons, associations and corporations and their pipe lines, oil and gas wells are subject to the jurisdiction conferred by law upon the Commission, and the Commission is authorized and empowered to make all necessary rules and regulations for the government and regulation of such persons."

[4] Art. 6029. "*Rules and Regulations*.—The Commis-

sion shall make and enforce rules and regulations for the conservation of oil and gas:

"1. To prevent the waste of oil and gas in drilling and producing operations and in the storage, piping and distribution thereof.

"2. To require dry or abandoned wells to be plugged in such way as to confine oil, gas and water in the strata in which they are found and to prevent them from escaping into other strata.

"3. For the drilling of wells and preserving a record thereof.

"4. To require such wells to be drilled in such manner as to prevent injury to the adjoining property.

"5. To prevent oil and gas and water from escaping from the strata in which they are found into other strata.

"6. To establish rules and regulations for shooting wells and for separating oil from gas.

"7. To require records to be kept and reports made by oil and gas drillers, operators and pipe line companies and by its inspectors.

"8. It shall do all things necessary for the conservation of oil and gas whether here especially enumerated or not, and shall establish such other rules and regulations as will be necessary to carry into effect this law and to conserve the oil and gas resources of the State."

purchasers and transporters of oil, to formulate and establish for the state, contrary to its long-established legislative policy forbidding combinations, agreements and arrangements in restraint of trade, and to affect the prices of commodities, the broad policy of so relating the supply of oil to the demand for it as to bring about and maintain the stabilization of the oil industry, through raising the price of oil both to the producer and the ultimate consumer and keeping it raised.

They say that this was to be accomplished by agreement and persuasion, as far as might be, but when these failed, by having the purchasers and transporters of oil boycott the recalcitrants and the commission proceed against them.

Those for the orders declare that the statute authorizing the suit puts upon plaintiffs the burden of proof to establish the unreasonableness of the orders. That until overthrown by such proof they must stand. That the motives, the purposes, the ultimate desires of the commission, of the oil companies, the oil committees and those who, working with them, have devised the scheme in question, have no bearing upon the validity of the regulation if as applied to the facts which it purports to fit, it validly regulates them. That, in short, the commission might have frankly declared that one of the purposes, or the main purpose, in mind was to reduce supply, if the rule as finally passed has the real and genuine effect to in a reasonable, fair, and adequate way prevent physical waste and not the merely accidentally incidental effect, as the result of shutting in production, of effecting some slight reduction in such waste.

Plaintiffs concede broadly that the motives, purposes, and intent of the commission are wholly immaterial if the complained of action is reasonably referable to its grant of powers, the conservation of oil, the prevention of physical waste, and in operation it has substantial relation to the granted power, even though that operation may accidentally or incidentally effect economic waste, a subject legislatively withdrawn from the commission. They deny that the commission, authorized as it was within limits to carry out a conservation policy against waste, as defined in the laws of the state, may, departing from that policy, establish a conservation policy of its own of the broadly economic kind in question here, with all the serious complications in which it is involved, the grave consequences which it entails, and make that policy effective against

attack by camouflaging with words its real purpose and effect, or by pointing to some result in keeping with its powers which may incidentally or accidentally flow from it. Siler v. Louisville & N. R. R., 213 U. S. 175, 29 S. Ct. 451, 53 L. Ed. 753; Minnesota v. Barber, 136 U. S. 313, 10 S. Ct. 862, 34 L. Ed. 455; Brimmer v. Rebman, 138 U. S. 78, 11 S. Ct. 213, 34 L. Ed. 862; Real Silk Hosiery Mills v. Portland, 268 U. S. 325, 45 S. Ct. 525, 69 L. Ed. 982.

■ This is settled law where the validity of legislative acts, state or national, is in question. Presumptively valid though such acts are, courts, bound to give effect not to fictions, but to realities, may not, in construing them, close their eyes to what all men can see. Disregarding pretense, subterfuge, and chicane, courts must, looking through form to substance, ascertain the true purpose of a statute not from its recitals of purpose, but from the operation and effect of it as applied and enforced. Smith v. Ry. Co., 181 U. S. 248, 21 S. Ct. 603, 45 L. Ed. 847; Bailey v. Drexel Furn. Co., 259 U. S. 20, 42 S. Ct. 449, 66 L. Ed. 817, 21 A. L. R. 1432; Lochner v. New York, 198 U. S. 64, 25 S. Ct. 539, 49 L. Ed. 937, 3 Ann. Cas. 1133; Meyer v. Nebraska, 262 U. S. 390, 43 S. Ct. 625, 67 L. Ed. 1042, 29 A. L. R. 1446; Henderson v. New York, 92 U. S. 259, 23 L. Ed. 543; Chy Lung v. Freeman, 92 U. S. 275, 23 L. Ed. 550.

Certainly when a subordinate body like the railroad commission of Texas undertakes as here to deal in a broadly restrictive way with the right of a citizen to produce the oil which under the law of this state he owns, it must be prepared to answer his imperious query, "is it not lawful for me to do what I will with mine own," by pointing to a clear delegation of legislative power. This must be found, not in the recitative portions of its orders, for the commission may not more than any other agent, lifting itself by its bootstraps, supply, by claiming, the power it does not have, but in the statutes themselves, which have created, which control, and which are the source of the commission's power.

Especially must this be so when, as here, under the thinly veiled pretense of going about to prevent physical waste the commission has, in co-operation with persons interested in raising and maintaining prices of oil and its refined products, set on foot a plan which, seated in a desire to bring supply within the compass of demand, derives its impulse and spring from, and finds its

scope and its extent in the attempt to control the delicate adjustment of market supply and demand, in order to bring and keep oil prices up.

We have searched for but we cannot read in any legislative pronouncement, support for what the commission has done here. Authorized as we believe it to be to make rules and regulations reasonable and just, having a true and direct relation to the conservation of oil and gas, we can find no authority for its launching upon the policy in question.

This policy of the artificial forcing of prices by governmental action, in co-operation with those in the oil industry interested in raising prices, by either stimulating demand or keeping supply in bounds has never been attempted in this state by the Legislature itself; on the contrary, it has heretofore not only not established such policy, but has forbidden, by positive penal laws, the application of such artificial stimuli through private concert and agreement.

In the light of such long established policy, and of the language of the oil conservation statute itself, excluding from the statutory definition "economic waste," we think it plain that whether the Legislature could lawfully have exercised this power, either directly or through a delegation of it to the commission, it has not only not confided the exercise of it to the commission, but has flatly withheld such power from it.

In short, we believe that the orders in question are unreasonable and void as to plaintiffs because issued in the attempted exercise, not of delegated, but of usurped powers. As usurpations, under the authority of the statutes of Texas authorizing this suit, we strike them down.

We find it unnecessary then to, indeed we may not in accordance with established law, inquire into the constitutional questions raised. Siler v. Louisville & N. R. R., 213 U. S. 175, 29 S. Ct. 451, 53 L. Ed. 753.

Let a decree in accordance with this opinion be prepared and filed.