PEOPLE'S PETROLEUM PRODUCERS, Inc., et al. v. STERLING et al., and eight other cases. *

Nos. 365, 386, 389, 392–396, 408.

District Court, E. D. Texas, Tyler Division.
July 19, 1932.

* See also subsequent opinion — F. Supp. —.

Saye, Smead & Saye, of Longview, Tex., for complainants.

Byron A. Irwin, of Shreveport, La., and D. H. Culton and S. A. L. Morgan, both of Amarillo, Tex. (Morgan, Culton, Morgan & Britain, of Amarillo, Tex., of counsel), for complainants Bill & Dave Corporation and others.

Before HUTCHESON, Circuit Judge, and GRUBB and BRYANT, District Judges.

HUTCHESON, Circuit Judge.

In these cases the parties have agreed that a temporary restraining order, issued against the so-called martial law defendants R. S. Sterling, W. W. Sterling, Jacob F. Wolters, and L. S. Davidson, is to remain in force, further orders as to them to abide the decision of the Supreme Court of the United States on the Constantin appeal. The cases are before us now for action on the application of plaintiffs for a temporary injunction against the Railroad Commission, the Attorney General, et al. In their last analysis, they present another stand by some of the producers of oil in the East Texas Oil field against the claimed usurpation of power on the part of agencies purporting to act for the state. In the general sense that they challenge the power as unlawfully put forth behind a mask of pretense to accomplish the forbidden purpose of restricting production, they thresh again old straw. Danciger v. Commission (Tex. Civ. App.) 49 S.W.(2d) 837; MacMillan v. Commission (D. C.) 51 F.(2d) 400; Constantin v. Smith (D. C.) 57 F.(2d) 227, 228.

Most of the plaintiffs mainly pitch their case as McMillan did, upon the proposition that the orders assailed are not true conservation orders within the scope and purpose of the statute against waste. They say, as they did there, that the orders are purely production restrictions, and that as such they find, not support, but condemnation, in the statute, which provides: "Provided, however, this shall not be construed to mean economic waste, and the Commission shall not have power to attempt by order, or otherwise, directly or indirectly, to limit the production of oil to equal the existing market demand."

Plaintiffs point to the proposal of Thurman Hill, chairman of the meeting of the Oil States Advisory Committee, that, in order to secure a fair price for crude oil now being produced in the Mid-Continent fields, the several oil states by their regulatory bodies here assembled pledge themselves to restrict the output of crude oil in their states[1]; to the agreement which followed this proposal, "that production of crude oil in the United States should be limited to the market demand, which was fixed at 2,376,000 barrels per day, and that of this figure Texas should contribute 900,000 barrels"; to the testimony of Charles F. Roeser, by deposition in December, 1931, that the activities of the Texas Oil & Gas Conservation Association were directed to attempting to control the production in East Texas, so as in co-operation with the balance of the state, oil production in Texas could be what the market would absorb, "we men in the producing business realize that it would be impossible for the market to absorb over 900,000 barrels from the state"; to the testimony of Cullen Thomas and others, that the Railroad Commission had signed the Oil States agreement with the proviso that they would co-operate to limit production in so far as they could legally do so; to the orders of the commission reducing the allowable per well until October, when they were enjoined; to the action of the Governor in then instituting martial law, as plaintiffs claim, to limit production by force; to the action of the commission, on resuming control of the field, in reducing the field allowable to 325,000 barrels distributed per well; and to the action of the military since, as shown in plaintiffs' proof, in punitorily seizing and sealing wells which had produced more than the allowable—as conclusive proof that the purpose of the commission in making the orders was not to prevent physical waste, but merely to keep production within demand. They assert that, designed and effective only to limit production and having no reasonable relation to the prevention of physical waste, the orders are invalid, because not within the authorization of the statute, but contrary to its express prohibitions.

Some of the plaintiffs, while adopting these views, also assail both orders and statute as violative of the due process clauses of State and Federal Constitutions (Const. Tex. art. 1, § 19; Const. U. S. Amend. 14).

The defendants, while stoutly asserting that the action of the commission now sought to be enjoined was not taken under the influence of the desire, or with the purpose, to limit production, that its real purpose, in the sense of motive, was in accordance with the statutes of the state to prevent and control waste in the field, as stoutly argue that the motives of the commission, that is, the secret springs from which their actions have flowed, may not be inquired into by the courts, that their purpose may be discovered only in the operation and effect of their orders, and that, if these orders in their operation and effect have a reasonable relation to the duty and power of the commission, they may not be assailed for motive.

They say, pointing to the statutes, that the Legislature has conferred upon them broad and comprehensive powers, and given clear and definite directions for their exercise,[2] and that not only have plaintiffs

---

[1] The Oil & Gas Journal, Sept. 17, 1931, p. 13. Complainants' Exhibit No. 9. In the course of his address Hill further said: "Conditions today require direct action. The federal court decisions forbidding states to fix oil prices are based on erroneous conclusions that oil and its derivatives are not tinged with public interest. After the past year's oil activities only an indifferent court, insensible to what is going on about it, would deny the public interest in oil. * * * If we here assembled can agree upon the maximum amount of oil each state will be permitted to produce, and have co-ordination in like manner with importers, it should be understood and carried out as a states' gentlemen's agreement. This curtailment policy is contingent upon the above suggested fair price being paid within thirty days from September 15, 1931. All that need be done is to keep production down to demand. The price will then take care of itself. At the present low price it would be better if the oil remained in the ground one year, or even two years."

[2] Article 6014, Rev. St. 1925 (as amended Acts of 1931, 1st Called Sess. c. 26 [Vernon's Ann. Civ. St. art. 6014]), "Waste":

"Neither natural gas nor crude petroleum shall be produced, transported, stored or used in such manner or under such conditions as to constitute waste; provided, however, this shall not be construed to mean economic waste, and the Commission shall not have power to attempt by order, or otherwise, directly or indirectly, to limit the production of oil to equal the existing market demand for oil; and that power is expressly withheld from the Commission, and no part of this Act shall ever be construed so as to prevent the storage of oil except for the prevention of physical waste. As used herein, the term 'waste' in addition to its ordinary meaning, shall include:

"(a) The operation of any oil well or wells with a gas-oil ratio exceeding that fixed for such well or wells by order of the Commission, and the Commission is hereby given authority to fix and determine by order such ratio.

"(b) Drowning with water of any stratum capable of producing oil or gas, or both oil and gas in paying quantities.

"(c) Underground waste caused by the premature intrusion of water into any producing well or wells or into wells producing from the same stratum, resulting from improper drilling or producing methods by the owner of such well or wells.

"(d) Permitting any natural gas well to wastefully burn.

"(e) The wasteful utilization of natural gas; provided, however, the utilization of gas from a well

failed to offer evidence rebutting the prima facies which the commission's orders carry, but the evidence of the defendants is overwhelming that the rules of the commission, in treating the East Texas field as substantially one pool, limiting production from that pool to 325,000 barrels, and prorating the limited production per well, are not only not unreasonable and arbitrary, but are affirmatively shown to be reasonable and proper rules to effect the legislative end, the conservation of the petroleum resources of the state against physical waste. To the view of plaintiffs, that because of the "rule of property" in this state established in Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566, that owners of land and purchasers of oil rights own the oil in place, the Legislature may not regulate or control the manner of its production, and that, if it may, its delegation of that power to the commission is invalid, defendants oppose 'the many cases in the state and federal courts of Texas which have held otherwise. Danciger v. Commission (Tex. Civ. App.) 49 S.W.(2d) 837; our cases of MacMillan v. Commission (D. C.)

51 F.(2d) 400; Henderson v. Commission (D. C.) 56 F.(2d) 218, 220; Constantin v. Smith (D. C.) 57 F.(2d) 227, 228; and cases cited in them. They assert that, oil being a natural resource, and the rights of the person to take the oil in the several states being substantially the same, in fact, though different in name, there can in principle be no less power in one state than in another to reasonably regulate and control, in the interest of conservation, the manner of its findings and production.

They say, finally, that, not only are the Texas conservation laws valid, the commission authorized as the statutory agent of the state to make them effective, and the rules in question in their general effect within the authorization of such laws, but that on this record there is no basis for a finding that they are, as to plaintiffs, so unnecessarily restrictive of private rights as to warrant the conclusion that the rules are, in a constitutional sense, confiscatory as constituting a taking of plaintiffs' property; that the record, in fact, shows the contrary.

We have carefully examined the record

producing both oil and gas, for manufacturing natural gasoline, shall not be construed to be waste.

"(f) The creating of unnecessary fire hazards.

"(g) Actual physical waste incident to or resulting from so drilling, equipping, locating, spacing, or operating wells as to reduce, or tend to reduce, the ultimate total recovery of crude petroleum oil or natural gas from any well or pool.

"(h) Waste incident to or resulting from the unnecessary, inefficient, excessive, or improper use of the gas, gas energy, or water drive in any well or pool; however, it is not the intent of this Act to require repressuring of an oil pool, or that the separately owned properties in any pool be unitized under one management, control, or ownership.

"(i) Surface waste, including unnecessary or excessive surface losses or destruction of crude petroleum oil or natural gas without beneficial use.

"(j) The escape into the open air of natural gas except as may be necessary in the drilling or operation of a well; this section shall be cumulative of and not contrary to the above definitions of waste, and shall not be construed to conflict therewith.

"(k) Waste incident to the inequitable utilization of gas energy, water drive, or other natural force, resulting from the inequitable withdrawal from any common pool; provided, however, that the Commission shall only invoke this definition of waste for the purpose of preventing discrimination in production as between producers disposing of their oil and/or gas by means of regulated carriers and those producers disposing of their oil and/or gas by means of unregulated carriers.

"The Commission shall at no time have authority to make any rule or regulation, or to in any wise determine or hold that any mode, manner, or process of refining crude oil constitutes waste. Nothing in this Act shall require the owner of any gas and/or oil well to curtail the production thereof unless the same is being operated in such manner as to constitute waste as herein defined or contributing to waste as herein defined."

Article 6049c, § 7 (Vernon's Ann. Civ. St. Tex.): "The Commission shall have the right when it reasonably appears, and shall upon the verified complaint of any party showing that physical waste of crude petroleum oil or natural gas is taking place in this State, or is reasonably imminent, to hold such hearings at such times and places as it may fix, to determine whether or not such waste is taking place, or is reasonably imminent, and to make inquiry into what rule, if any, or what regulation or order should be made, and what action, if any, should be taken to correct, prevent, or lessen the same within the meaning of this Act. Notice of such hearings shall be given as provided by law. All parties interested shall be entitled to be heard and introduce evidence and shall have the right to process for witnesses and the production of evidence. The Commission upon such hearing, if it finds that waste is taking place or is reasonably imminent, shall make and enter such rule, regulation or order as in its judgment the facts justify, in order to correct, prevent or lessen such waste, if any. If it is the judgment of the Commission that any reduction or adjustment in the production of oil or gas from any well or pool is necessary in order to prevent the waste as herein defined of crude petroleum or natural gas from any such well or pool, the Commission shall determine how to accomplish such reduction or adjustment and such order shall be made in such manner as to distribute, prorate or otherwise apportion such reduction or adjustment among the wells committing such waste or contributing thereto as the facts justly and equitably require. Any properties, well or pools within this State may be described or referred to by the Commission in such proceedings and in making of such rules, regulations or orders, in general terms or by using well understood names or descriptions thereof, or may otherwise identify the same by general or special descriptions.

"From and after the hearing and the promulgation of any rule or order of the Commission, it shall be the duty of all parties affected thereby, to comply with the same. From time to time after notice and hearing the Commission may amend, revoke, suspend, renew or extend any such rule or order so made, to such extent and under such circumstances as may justly and equitably be necessary."

in the light of these contentions. We have been, and are, greatly impressed with the manifold evidences of the desire, the dominant purpose, on the part of the oil industry, to get and keep crude prices up, and with, to say the least of it, the complaisant if not compliant attitude of the public officials toward that desire, and if, as the plaintiffs seem to think it is, the controlling issue in this case were whether the commission, as it agreed last year to do, is co-operating as far as it legally can in keeping the production from the Texas oil fields within definite limits, we should, I think, be blind to what all others see, if we found it otherwise than as plaintiffs contend.

■ That is not, it cannot be, the issue in the case, for it is definitely and beyond cavil settled that in a constitutional government such as ours, with its division of powers, courts may not, except as the purpose is exhibited in their operation and effect, inquire into the purposes or the motives behind legislative acts.[3] McCray v. U. S., 195 U.

[3] "No instance is afforded from the foundation of the government where an act which was within a power conferred, was declared to be repugnant to the Constitution, because it appeared to the judicial mind that the particular exertion of constitutional power was either unwise or unjust. * : * It is, however, argued, if a lawful power may be exerted for an unlawful purpose, and thus, by abusing the power, it may be made to accomplish a result not intended by the Constitution, all limitations of power must disappear. * * * This, when reduced to its last analysis, comes to this: that, because a particular department of the government may exert its lawful powers with the object or motive of reaching an end not justified, therefore it becomes the duty of the judiciary to restrain the exercise of a lawful power wherever it seems to the judicial mind that such lawful power has been abused. But this reduces itself to the contention that, under our constitutional system. the abuse by one department of the government of its lawful powers is to be corrected by the abuse of its powers by another department." McCray v. U. S., 195 U. S. 54, 24 S. Ct. 769, 775, 49 L. Ed. 78, 1 Ann. Cas. 561.

"It is, of course, true, as suggested, that if there be no authority in the judiciary to restrain a lawful exercise of power by another department of the government, where a wrong motive or purpose has impelled to the exertion of the power, that abuses of a power conferred may be temporarily effectual. The remedy for this, however, lies, not in the abuse by the judicial authority of its functions, but in the people, upon whom, after all, under our institutions, reliance must be placed for the correction of abuses committed in the exercise of a lawful power. This was aptly pointed out in Champion v. Ames, 188 U. S. 321, 23 S. Ct. 321, 47 L. Ed. 492; where * * * it was said: 'But if what Congress does is within the limits of its power, and is simply unwise or injurious, the remedy [lies with the people]. * * *'

"The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted." McCray v. U. S., 195 U. S. 56, 24 S. Ct. 769, 776, 49 L. Ed. 78, 1 Ann. Cas. 561.

S. 60, 24 S. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561; Angle v. Chicago, St. Paul Ry., 151 U. S. 12, 14 S. Ct. 240, 38 L. Ed. 55; Soon Hing v. Crowley, 113 U. S. 713, 5 S. Ct. 730, 28 L. Ed. 1145[4]; Smith v. St. Louis & Southwestern Ry., 181 U. S. 248, 21 S. Ct. 603, 45 L. Ed. 847; Purity Extract Co. v. Lynch, 226 U. S. 199, 33 S. Ct. 44, 57 L. Ed. 184; MacMillan v. Commission (D. C.) 51 F.(2d) 400, 402; McLeaish v. Binford (D. C.) 52 F.(2d) 151; Railroad Commission v. Galveston Chamber of Commerce, 105 Tex. 115, 145 S. W. 573.

In the MacMillan Case we pointed this out, but there "plaintiff established that the allowable for the East Texas fields was fixed at an arbitrary basis, arrived at without test or experimentation, either on plaintiff's property or in the field generally, as to the amount that might be safely withdrawn by each owner from his property without causing any physical waste. He made it clear that the allowable had been fixed arbitrarily, and that therefore the plan so adopted and promulgated had the same relation to physical waste as an order not pinching in, but shutting the wells down absolutely would have, differing from such an order not in kind, but only in degree. That the plan was therefore bound to result in arbitrarily depriving plaintiffs of the right to produce their oil in accordance with their prudent judgment and desire, without any precedent finding having been made, that the amount which plaintiffs desired to produce would actually cause physical waste. Plaintiffs, in short, established that the only kind of waste which the orders are designed to and do deal directly with, is economic waste, the loss of market price because of market glut. That such effect, if any, as they might have to prevent not economic, but physical waste,

[4] "The rule is general, with reference to the enactments of all legislative bodies, that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the acts, or inferable from their operation, considered with reference to the condition of the country and existing legislation. The motives of the legislators, considered as to the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments. Their motives, considered as the moral inducements for their votes, will vary with the different members of the legislative body. The diverse character of such motives, and the impossibility of penetrating into the hearts of men and ascertaining the truth, precludes all such inquiries as impracticable and futile. And in the present case, even if the motives of the supervisors were as alleged, the ordinance would not be thereby changed from a legitimate police regulation, unless in its enforcement it is made to operate only against the class mentioned; and of this there is no pretense." Soon Hing v. Crowley, 113 U. S. 710, 711, 5 S. Ct. 730, 734, 28 L. Ed. 1145.

does not come fairly within the purpose or effect of the order, but is a purely accidental incident thereto."

We found there that the statutes which we set out in a footnote to the opinion did not authorize what the commission was doing. In this case, both the law and the facts before us are different. Here the commission operates under a grant of power ·of the broadest kind; in fact, so broad in terms is it that in the brief of Constantin it is contended that the grant of power is so unbounded as to amount to an unconstitutional delegation of legislative power. The statute construed in the MacMillan Case, passed be-, fore proration had come into use, took no account of it, and production was looked at per well not per pool; contribution to waste by one of a number of wells in a common pool was not even squinted at; while here the statute not only authorizes, it directs, the commission to consider the needs of a pool as a whole. It not only countenances, it directs, the institution of rules which, looking at the pool and the production from it. as a whole, in terms authorize the proration of that production where waste is occurring or is imminent.

Plaintiffs argue that what was authorized was not *proration of production*, but *proration of reduction*. The statute neither reads thus, nor may it be reasonably so construed. It in terms provides for a reduction, or *adjustment* in the production, and for prorating or otherwise apportioning such reduction or adjustment among the wells committing or contributing to such waste, as the facts justly and equitably require. The old statute looked at waste as committed singly and individually, each well by itself. The new statute, though it saves against the requirement of integration and unitization under one management and control, recognizes waste as brought about by contribution, introduces for the first time into the statutory prohibition against waste the idea that operations are to be looked at as a whole. It condemns equally and makes equally preventable individual commission of waste, or the commission of waste by contributing to a common result.

Upon the facts, instead of as in the MacMillan Case, a case of an arbitrary fixation of the allowable, in connection with an active program over the state looking to correlating production and demand by inducing offers to purchase oil, without proof that the amount had been based upon test and experimentations, we have here a mass of testimony as to tests and experiments made in the field,

and as to conclusions reached which, if believed, amply support the commission's view that the allowable of 325,000 barrels for the field is a wise provision against waste in the interest of the state and of all of the owners. In fact, the testimony of ˙E. O. Buck, a witness for the commission, disputed by no one, was to the effect that, in his opinion, as the result of these regulations, every person in the field will ultimately derive more from his wells than he would derive, if there·were no restrictions.

█ The brief of Constantin, in an earnest, interesting, and scholarly way presents the points of the invalidity of the statute itself because of the Texas rule regarding oil and gas as owned in place, and because the appointment of the commission to administer it is an unconstitutional delegation of power.

We are already committed by MacMillan, Henderson, and Constantin Cases, supra, to a contrary view. Because we are, we shall not ·prolong this opinion by a discussion of those questions here. We shall content ourselves with referring to those decisions and the cases which they cite as authority for the view we hold, that the rule of Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 S. Ct. 576, 44 L. Ed. 729, Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 S. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160, Walls v. Midland Carbon Co., 254 U. S.ᵥ300, 41 S. Ct. 118, 65 L. Ed. 276, Bandini Petroleum Co. v. Superior Court, 284 U. S. 8, 52 S. Ct. 103, 76 L. Ed. 136, 78 A. L. R. 826, and Champlin Refining Co. v. Corporation Comm. of Oklahoma, 286 U. S. 210, 52 S. Ct. 559, 76 L. Ed. ——, that the state has power to regulate the use of its natural resources so as to prevent their waste, obtains in Texas as to oil and gas.

In the light, then, of the present statute and the facts in this case, we are of the opinion that our decision in the MacMillan Case is authority, not for a finding that the orders of the commission are invalid as in general beyond the statutory powers granted them, but for one that they are in general accordance with the grant of power.

█ We are further of the opinion that in general the statutes and the rules are within constitutional limits and are valid.

█ However impressed, then, we might be with the force of the argument that the motive back of the orders is the control of production, these are not matters as ˏsuch, with which we may concern ourselves. Courts must judge the purpose of a legislative act by

its effect, and when measures, though in fact taken for purposes wholly foreign to the power exerted are found in their operation and effect to be within constitutional limits, for the courts the inquiry is ended. Our system of popular government, with its division of powers, permits no other result.

But this does not end our inquiry. Wide as is the scope of legislative authority and the power of those to whom the administration of that authority has been constitutionally delegated, vigorous as is the presumption of validity which attends their action, when within the general limits of their powers, there is yet a limit to the power of police. This limit is reached when the regulation transcends the public necessity. Police power is indeed paramount to private rights to the extent that public necessity requires its exercise; it is so only to that extent. The exercise of this power extends to and only to the point where a lawful use conflicts with a public interest, and not at all beyond. For it is a fundamental principle of government that a Legislature may not, under the guise of regulating, so unreasonably hamper and restrict a lawful use, as in effect to prevent it. McLeaish v. Binford (D. C.) 52 F.(2d) 151. Because this is so, it is for the courts in each case, when the issue is pressed, to determine as a question of fact whether the exertion of the power has been pushed beyond the necessities of the case. Constantin v. Smith (D. C.) 57 F.(2d) 227; Spann v. City of Dallas, 111 Tex. 350, 235 S. W. 513, 19 A. L. R. 1387[5]; Jacobson v. Massachusetts, 197 U. S. 28, 25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765[6]; Yick Wo v. Hopkins, 118 U. S. 373, 6 S. Ct. 1064, 30 L. Ed. 220; Smith v. St. Louis & S. W. R. Co. of Texas, 181 U. S. 255, 21 S. Ct. 603, 45 L. Ed. 847[7]; Wolff v. Industrial

Court, 262 U. S. 539, 43 S. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280[8]; Hannibal & St. J. R. Co. v. Husen, 95 U. S. 473, 24 L. Ed. 527; Seattle Trust Co. v. Roberge, 278 U. S. 121, 49 S. Ct. 50, 73 L. Ed. 210[9]; Women's Kansas City St. Andrew Soc. v. Kansas City (C. C. A.) 58 F.(2d) 593; Weaver v. Palmer, 270 U. S. 415, 46 S. Ct. 320, 70 L. Ed. 654; McLeaish v. Binford (D. C.) 52 F.(2d) 151, 154.

It remains to inquire whether, on their face or upon proof as to their incidence on plaintiffs' use, the restrictions bear more hardly on them than the public necessity of conservation requires.

We are not in doubt that the state has the power to regulate the production of natural resources so as to prevent its waste. Neither are we in any doubt that this power to regulate does not involve the power to take private property or destroy its value. Control within limits is one thing; control pressed to the point of denial of use is quite another. Orders, though generally in the nature of conservation orders, may not stand if they are so unreasonably and drastically restrictive beyond the necessities of the case that they plainly appear in their operation and effect as orders restricting production. In determining this question, substance and not form, will control. For, though purpose or motive may not be at all looked to where an act, clearly within the limits of the exerted power, operates in neither a discriminatory nor oppressive way, but reasonably exerts the power it purports to exercise (Soon Hing v. Crowley, 113 U. S. 710, 5 S. Ct. 730, 28 L. Ed. 1145), where it is urged against a law or regulation that it was enacted, not with an eye single to fairly exerted admitted constitutional power, but with an eye evil

---

[5] "The police power is founded in public necessity, and only public necessity can justify its exercise. The result of its operation is naturally, in most instances, the abridgment of private rights. Private rights are never to be sacrificed to a greater extent than necessary. Therefore, the return for their sacrifice through the exercise of the police power should be the attainment of some public object of sufficient necessity and importance to justly warrant the exertion of the power." Page 357 of 111 Tex., 235 S. W. 513, 515.

[6] "We say necessities of the case because it might be that an acknowledged power of a local community * * * might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public as to authorize or compel the courts to interfere for the protection of such persons." Page 28 of 197 U. S., 25 S. Ct. 358, 362.

[7] "It depends upon whether the police power of the state has been exerted beyond its province,—exerted to regulate interstate commerce,—exerted to ex-

clude, without discrimination, the good and the bad, the healthy and the diseased, and to an extent beyond *what is necessary for any proper quarantine.* The words in italics express an important qualification." Page 255 of 181 U. S., 21 S. Ct. 603, 605.

A statute may not stand if "considering the end in view, the statute passes the bounds of reason and assumes the character of a merely arbitrary fiat." Bartels v. Iowa, 262 U. S. 412, 43 S. Ct. 628, 630, 67 L. Ed. 1047, Holmes, J., dissenting.

[8] "To say that a business is clothed with a public interest is not to determine what regulation may be permissible in view of the private rights of the owner. * * * To say that a business is clothed with a public interest is not to import that the public may take over its entire management and run it at the expense of the owner. * * * This will be running the public interest argument into the ground." Page 539 of 262 U. S., 43 S. Ct. 630, 634.

[9] "Legislatures may not, under the guise of the police power impose restrictions that are unnecessary and unreasonable upon the use of private property or the pursuit of useful activities." Page 121 of 278 U. S., 49 S. Ct. 50, 52.

because it looked too much on the forbidden thing, that which it could not do, the courts may, indeed must, consider the act and its operation in the light of all the evidence and strike it down, if in its operation it appears to subject property to a confiscatory control which, transcending the public necessity in order to accomplish an end not permitted, it is beyond the power of the Legislature to institute. Yick Wo v. Hopkins, 118 U. S. 371, 6 S. Ct. 1064, 30 L. Ed. 220.[10]

█ It is upon this branch of the case, whether the orders transcend necessity, that we have had our gravest misgivings. The enormous and constantly increasing disproportion between actual and potential production, and the powerful and unremitting pressure of the oil industry as a whole for limited production in order to keep prices up, have caused us considerable question as to whether, in spite of their prima facies, the orders may stand.

The record, especially plaintiffs' interpretation of it, suggests that instead of with an eye single to conserving waste, regulations have been enacted in a sweeping way as a part of a general program to restrict production in the state, and that the absence of this singleness of purpose has induced a regulation which, while it does have relation to the prevention of waste, is unnecessarily drastic in its limitation upon production; that is, confines production from the plaintiffs' wells more greatly than the public necessity to conserve against waste requires, and results, as to plaintiffs, in an order illegally limiting their production.

The record, however, does no more than suggest this. It does not, as it was incumbent upon plaintiffs to have it do, establish it against the prima facies which the orders carry. We are without proof; we may not

<hr>

[10] "Though the law itself be fair on its face, and impartial in appliance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution." Page 374 of 118 U. S., 6 S. Ct. 1064, 1073.

conjecture whether these orders are beyond necessity, and that another plan of reduction for the field bringing about ratable and reasonable withdrawals of a considerably larger amount per well or upon the basis of potential, rather than per well, would accomplish the permissible purpose without trenching upon the unpermissible one. Instead of enlightening the court as to conditions in the field generally, and as to what might be expected under a different program generally applied, plaintiffs have pitched their case upon the view that the matter stands as to them, upon the proof of the condition of their individual wells, unrelated to other wells and the pool as a whole, and that they are under no obligation to furnish evidence as to a system of control which would reasonably attain the permissible public ends without unduly drastic effect upon plaintiffs. We are clear that the matter of field conditions in general may not be so approached and disposed of by plaintiffs, and that upon the record in this case, absent clear proof that the amount of withdrawals allowed or the method of distribution from the pool as a whole is restrictive as to plaintiffs beyond the necessities of the case, we cannot strike down as unlawful upon their face, the orders in question here, as, if they were orders entirely preventing production, or fixing a reductio ad absurdum in amount, we certainly could do.

We have concluded, therefore, upon the present record we should deny the temporary restraining order pending the hearing of this case on the merits, without prejudice, of course, to plaintiffs' right to relief if, upon final trial, in the light of a full disclosure of field conditions, it is made to appear that, motives and purposes aside (for with motives and purposes as such we have nothing to do, Soon Hing v. Crowley, supra) the restrictions on plaintiffs' production, though imposed in the general exercise of an admitted police power, have been, either inadvertently or with intention, because of an eye not single, imposed in violation of the rule that the police power exercised here finds its place in and is limited to the necessities of the case.